**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

KAMI ETEMADI,

*Petitioner*,

v.

MERRICK B. GARLAND, Attorney General,

*Respondent.*

No. 18-72318

Agency No. A074-808-492

OPINION

On Petition for Review of an Order of the Board of Immigration Appeals

Argued and Submitted February 11, 2021
Pasadena, California

Filed September 9, 2021

Before: Danny J. Boggs,* Milan D. Smith, Jr., and Mary H. Murguia, Circuit Judges.

Opinion by Judge Boggs;
Dissent by Judge Milan D. Smith, Jr.

---

\* The Honorable Danny J. Boggs, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

## SUMMARY[**]

### Immigration

Granting Kami Etemadi's petition for review of the Board of Immigration Appeals' denial of a motion to reopen based on changed country conditions, and remanding, the panel held that: (1) the law-of-the-case doctrine did not require it to accept a prior panel's determination that Etemadi is not a Christian; (2) Etemadi was not required to reattach his application for relief to his motion to reopen; and (3) Etemadi demonstrated changed country conditions in Iran concerning the treatment of Christians and made a prima facie showing of entitlement to Convention Against Torture relief.

As an initial matter, the panel rejected the government's argument that Etemadi was foreclosed from CAT relief under the law-of-the-case doctrine. The panel concluded that an exception to the doctrine applied because the prior panel's decision was clearly erroneous as to its determination that Etemadi was not a Christian, and enforcement of the prior decision would work a manifest injustice. First, the panel explained that the prior panel clearly erred when it failed to correct or even acknowledge that a primary basis for the IJ's adverse credibility finding rested on a material error concerning whether Etemadi deliberately evaded a question concerning his Christian denomination. The panel wrote that the prior panel and the IJ also erred by failing to address the abundant evidence that

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Etemadi is a Christian. Next, the panel concluded that the prior panel clearly erred in accepting the IJ's application of the *falsus in uno*, *falsus in omnibus* maxim. The panel explained that, at most, an adverse credibility determination may be used to invalidate an applicant's testimony, but the *falsus* maxim may not be used to wipe out an entire claim that is corroborated by other evidence. The panel explained that the IJ must still examine the corroborating evidence. Because the IJ failed to do so here, the panel concluded that the prior panel clearly erred in affirming the IJ's determination. Finally, the panel concluded that pursuant to *Kamalthas v. INS*, 251 F.3d 1279 (9th Cir. 2001), the IJ erred in allowing the adverse credibility determination as to Etemadi's political opinion claim to wash over his unrelated CAT claim.

Addressing the Board's denial of the motion to reopen based on Etemadi's failure to include an application for relief, as required by 8 U.S.C. § 1003.2(c)(1), the panel first determined that Etemadi had not waived any challenge to the Board's interpretation of that provision. Next, considering the issue de novo, the panel concluded that Etemadi was not required to submit a new application because the text of § 1003.2(c)(1) makes a distinction between a motion to reopen proceedings and a motion to reopen proceedings for the purpose of submitting an application for relief. Here, Etemadi previously submitted an application for relief based on his religious persecution claim, and referred to it repeatedly in his motion to reopen in which he sought CAT relief on the same grounds. The panel concluded that Etemadi was required to do no more. The panel wrote that it also need not defer to the Board's interpretation of § 1003.2(c)(1) because there was no indication that the Board's interpretation was the agency's "authoritative" or "official" position on the issue. Moreover, even if the

Board's interpretation was considered representative of the agency's official views, the panel concluded that the regulation was not genuinely ambiguous.

Next, the panel concluded that the Board abused its discretion in determining that Etemadi failed to establish changed country conditions or prima facie eligibility for CAT relief. First, the panel explained that on a motion to reopen the Board is required to accept as true the facts stated in an affidavit unless they are inherently unbelievable. Although an exception to the rule applies when the affidavit is contradicted by previous findings that are supported by substantial evidence, the panel concluded that the exception did not apply because the IJ, Board, and prior panel's findings that Etemadi was not a Christian were not supported by substantial evidence. The panel also concluded that the Board erred by failing to address compelling evidence showing that conditions had become qualitatively worse for Christians in Iran. The panel held that Etemadi established prima facie eligibility for CAT relief, and remanded for a new hearing to consider all evidence of Etemadi's Christian faith and whether Etemadi is more likely than not to face torture if removed to Iran.

Dissenting, Judge M. Smith wrote that the question presented in this case is not whether Etemadi is a Christian or even whether it is more likely than not that he would be tortured if removed to Iran, but rather whether the court should cast aside a prior panel's disposition, whether it should excuse waiver and decide an issue of first impression without briefing, and whether the Board abused its discretion in analyzing the Iranian government's persecution of Christians over the past thirty years. Judge M. Smith wrote that for each of these questions, precedent mandates very deferential standards of review, yet the majority disregards

the questions presented and bypasses the deference owed to the prior panel and the Board.

Judge M. Smith wrote that, contrary to the majority's suggestion otherwise, the law-of-the case doctrine applies to a prior panel's application of the substantial evidence standard for IJ credibility determinations. Judge M. Smith wrote that the majority misunderstands the standard of review applicable to this case, explaining that when the court revisits a prior panel's affirmance of an IJ's factual determination, the standard is doubly deferential. The court must determine whether the prior panel clearly erred in holding that substantial evidence supported the IJ's adverse credibility finding. In other words, it must be left with the definite and firm conviction that any reasonable adjudicator would be compelled to conclude that the IJ's credibility determination did not meet the low bar of "more than a scintilla, but less than a preponderance" of the evidence. Judge M. Smith wrote that were the panel reviewing the IJ's adverse credibility determination under de novo review, or even on direct appeal pursuant to a substantial evidence standard, a reversal of the adverse credibility determination might be defensible. However, because it is governed by the doubly deferential standard, Judge M. Smith could not join the majority's analysis or conclusion.

Addressing the Board's interpretation of § 1003.2(c)(1), Judge M. Smith first wrote that in his view, none of the exceptions to waiver apply here. Judge M. Smith also explained that the majority decision creates a circuit split, all without briefing from the parties. Judge M. Smith wrote that without briefing, it was unclear whether the Board's interpretation of § 1003.2(c)(1) was deserving of deference, especially in light of the recently-announced *Kisor* framework. Judge M. Smith wrote that a case in which the

petitioner has waived an issue is not the proper vehicle to make a pronouncement that will bind future panels of this court.

Judge M. Smith also wrote that while Etemadi need only make a prima facie case for CAT relief at this stage, the majority's reliance on changed conditions regarding general persecution of Christian converts, rather than torture of those individuals, shows that the Board did not abuse its discretion in denying the motion to reopen. Judge M. Smith also wrote that the majority does not demonstrate that the recent country reports constitute evidence that Iran has increased its torture of Christians.

---

## COUNSEL

Judith L. Wood (argued) and Beth S. Persky, Law Offices of Judith L. Wood, Los Angeles, California, for Petitioner.

Madeline Henley (argued), Trial Attorney; Leslie McKay, Senior Litigation Counsel; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

**OPINION**

BOGGS, Circuit Judge:

Kami Etemadi, a citizen and native of Iran, came to the United States in 1996 and made a life in Los Angeles. After being introduced to an Iranian American church, he converted to Christianity and was baptized in 1999. The government maintains his faith is false, and endeavors to deport him. Etemadi desires to remain in the United States with his American wife and family. He fears that if he is deported to Iran, he will be tortured or killed for his faith. He has filed a motion to reopen, which the Board of Immigration Appeals (BIA) has denied. We face three questions: First, whether the law-of-the-case doctrine requires that we accept a prior Ninth Circuit panel's determination that the immigration judge's (IJ) finding that Etemadi is not a Christian was supported by substantial evidence. Second, whether Etemadi was required to reattach his application for relief to his motion to reopen. And third, whether Etemadi has demonstrated changed country conditions for Christians in Iran to warrant reopening his application under the Convention Against Torture. We grant Etemadi's petition and remand for a new hearing to consider all evidence of Etemadi's Christian faith and whether Etemadi is more likely than not to face torture if removed to Iran.

## I. JURISDICTION AND STANDARD OF REVIEW

The BIA's denial of a motion to reopen is a final order of removal, which this court has jurisdiction to review under 8 U.S.C. § 1252(a)(1). "A denial of a motion to reopen immigration proceedings is generally reviewed for abuse of discretion; however, where . . . the issue presented is a

'purely legal question,' a *de novo* standard applies." *Alali-Amin v. Mukasey*, 523 F.3d 1039, 1041 (9th Cir. 2008) (quoting *Cano-Merida v. INS*, 311 F.3d 960, 964 (9th Cir. 2002)).

## II. FACTS AND PROCEDURE

Etemadi was served with a Notice to Appear in April 1997 and charged with removability under 8 U.S.C. § 1182(a)(6)(A)(i) as a noncitizen present in the United States without having been admitted or paroled. He sought the help of a man known as Reza Tabatabai, who Etemadi believed was an immigration lawyer. Etemadi had seen Tabatabai's immigration-assistance advertisements in a local magazine and Tabatabai had been recommended to Etemadi by people in the Iranian-American community. In truth, Tabatabai was neither a lawyer nor an immigration expert, but an "expert" in forging immigration documents and falsifying applications. Under Tabatabai's instruction, Etemadi conceded removability, and applied for asylum and withholding of removal under the Immigration and Nationality Act and protection under the Convention Against Torture (CAT) on account of his political opposition to the Iranian government. To improve Etemadi's chances of being granted asylum, Tabatabai embellished Etemadi's asylum application with falsehoods, forged documents, and directed Etemadi to lie to the IJ. Etemadi followed his instructions and falsely testified that the forged documents were authentic. In March 1999, the Federal Bureau of Investigation arrested Tabatabai, who shortly thereafter pleaded guilty to federal crimes, including those related to asylum fraud.

In 2000, no longer working with Tabatabai and having since become a Christian, Etemadi amended his application

to add fear of religious persecution as a separate ground for relief.

At his merits hearing in 2002, Etemadi admitted that some documents he submitted in support of his political asylum application were forged and that he had misrepresented his past persecution in Iran based on his political opinion. In October 2002, the IJ issued an oral decision denying Etemadi any relief. The IJ found Etemadi's political-asylum claim to be frivolous. Although Etemadi responded to the IJ's questioning regarding his Christian faith, the IJ "discount[ed] all testimony offered by [Etemadi]." The IJ also determined that none of his claims—including the claim that he is a Christian and thus eligible for CAT relief—were credible. Despite repeated requests by Etemadi's lawyer, the IJ refused to hear from Etemadi's pastor to confirm that he was a sincere Christian and active member of the Iranian Christian Church in San Jose. The IJ's three-sentence CAT analysis misstated an important part of the record and ignored undisputed documentary evidence corroborating the claim that Etemadi is a Christian.

In May 2004, the BIA adopted the IJ's decision in a one-paragraph decision. The BIA decision analyzed none of the claims Etemadi raised on appeal, which included a challenge to the errors in the IJ's factfinding.

In October 2007, the Ninth Circuit denied Etemadi's petition for review and later petition for rehearing en banc in an unpublished opinion. *See Etemadi v. Keisler*, 251 F. App'x 388 (9th Cir. 2007). The prior panel concluded that substantial evidence supported the IJ's finding that Etemadi's political-asylum application was frivolous and that Etemadi is not a Christian. *Id.* at 389–90.

In May 2018, Etemadi filed a motion with the BIA to reopen his proceedings, based on changed country conditions for Christians in Iran. Alternatively, he asked the BIA to exercise its sua sponte reopening authority.

In August 2018, the BIA denied Etemadi's motion to reopen on three grounds. First, it held that Etemadi had not submitted the required application for relief. *See* 8 C.F.R. § 1003.2(c)(1). Second, the BIA determined that any evidence of changed country conditions for Christians was irrelevant because he was found not to be a Christian and that any challenge to his credibility determination was untimely. Third, the BIA found that, even if Etemadi is a Christian, he had failed to introduce adequate, previously unavailable evidence to demonstrate that conditions in Iran are worse now for Christians than at the time of his 2002 immigration hearing. The BIA found no exceptional situation warranted reopening sua sponte and also concluded that Etemadi's frivolous asylum claim barred him from adjustment of his status based on his marriage to a United States citizen. On August 21, 2018, Etemadi filed this petition for review. Although there is no time limit for a motion to reopen a withholding of removal claim based on changed country conditions, Etemadi raises on appeal only his CAT claim related to his Christian faith.

## III. ANALYSIS

### A. *The Law-of-the-Case Doctrine*

The government argues that the law-of-the-case doctrine forecloses Etemadi from CAT relief because the prior panel accepted the agency's determination that he is not a Christian. *See Etemadi*, 251 F. App'x at 389. The "doctrine states that the decision of an appellate court on a legal issue

must be followed in all subsequent proceedings in the same case." *In re Rainbow Mag., Inc.*, 77 F.3d 278, 281 (9th Cir. 1996) (quoting *Herrington v. Cnty. of Sonoma*, 12 F.3d 901, 904 (9th Cir. 1993)).

The law-of-the-case doctrine is "a guide to discretion." *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997); *see also United States v. Lewis*, 611 F.3d 1172, 1179 (9th Cir. 2010) (citing *Messenger v. Anderson*, 225 U.S. 436, 444 (1912)). It "is not a doctrine of inescapable application." *Ferreira v. Borja*, 93 F.3d 671, 674 (9th Cir. 1996). Still, "a prior decision should be followed unless (1) the decision is clearly erroneous and its enforcement would work a manifest injustice; (2) intervening controlling authority makes reconsideration appropriate; or (3) substantially different evidence was adduced at a subsequent trial." *Alaimalo v. United States*, 645 F.3d 1042, 1049 (9th Cir. 2011) (citing *Hegler v. Borg*, 50 F.3d 1472, 1475 (9th Cir. 1995)). The prior panel accepted the agency's determination that Etemadi is not a Christian, which was not a legal determination but a mixed question of law and fact because it required the prior panel to apply a legal standard to disputed facts. "When a mixed question of law and fact is presented, the standard of review turns on whether factual matters or legal matters predominate." *United States v. Mateo-Mendez*, 215 F.3d 1039, 1042 (9th Cir. 2000) (quotation omitted). In Etemadi's appeal to the prior panel, the factual issues were predominant because there was no dispute that the substantial-evidence legal standard applied to the Agency's factual determinations. The dispute among the parties primarily concerned the weight of the evidence regarding the agency's determination that Etemadi is not a Christian.

Because the law-of-the-case doctrine applies to legal issues, and because the prior panel decided a facts-predominant mixed question of law and fact, the law-of-the-case doctrine likely does not apply here at all. But even if it does, the first exception to the law-of-the-case doctrine applies to Etemadi's case.

### Clear Error

While we do not make the decision to reject the prior panel's conclusion lightly, the prior panel's decision was clearly erroneous and enforcing it against Etemadi would be unjust. "[A] finding is 'clearly erroneous' when[,] although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (quotation omitted). If deported now, Etemadi will suffer a manifest injustice because no adjudicator has given his claim the consideration required by law.

The prior panel upheld the IJ's determination under the substantial-evidence standard: "[A]dministrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Farah v. Ashcroft*, 348 F.3d 1153, 1156 (9th Cir. 2003) (quoting 8 U.S.C. § 1252(b)(4)(A)–(B)). "Substantial evidence is 'more than a mere scintilla,' and means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The substantial-evidence standard is even more deferential than the clear-error standard. *See, e.g.*, *Dickinson v. Zurko*, 527 U.S. 150, 165 (1999) (holding that the more deferential substantial-

evidence standard, and not the "stricter" and less deferential clear-error standard, applies to challenges to Patent and Trademark Office's patent denials, as it does to other agencies). However, although "the substantial evidence standard demands deference to the IJ, '[w]e do not accept blindly an IJ's conclusion that a petitioner is not credible. Rather, we examine the record to see whether substantial evidence supports that conclusion and determine whether the reasoning employed by the IJ is fatally flawed.'" *Gui v. INS*, 280 F.3d 1217, 1225 (9th Cir. 2002) (quoting *Osorio v. INS,* 99 F.3d 928, 931 (9th Cir. 1996)). The IJ's conclusion must be *reasonable*. *Biestek*, 139 S. Ct. at 1154. After reviewing the record, we are left with the firm and definite conviction that the prior panel erred in accepting the IJ's flawed decision, which was unsupported by substantial evidence.

A petitioner at this stage must succeed under both the substantial-evidence standard and the clear-error standard to prevail. But because the substantial-evidence standard requires that we give more deference to agency determinations than we must give to a prior panel under the clear-error standard, a prior panel's error that substantial evidence supported an agency's determination will necessarily be "clearly erroneous" under the first exception to the law-of-the-case doctrine.[1] In other words, if the

---

[1] The dissent concedes that if we were to review the IJ's adverse-credibility determination under the substantial-evidence standard, finding against the agency "might be defensible." Dissent at 44. But the dissent argues that, when we revisit a prior panel's acceptance of an IJ's factual determination, our standard of review is even more deferential than substantial-evidence review. Dissent at 43. We disagree. A prior panel's incorrect determination that an IJ's decision was supported by substantial evidence is necessarily clear error because more deference is required under the substantial-evidence standard than the clear-error standard.

agency error was so wrong that "any reasonable adjudicator would be compelled to conclude to the contrary," *Farah*, 348 F.3d at 1156, and the prior panel does not conclude to the contrary, a subsequent panel will be "left with the definite and firm conviction that a mistake has been committed," *Anderson*, 470 U.S. at 573 (quotation omitted), by the prior panel. Here, the prior panel made three errors when it failed to examine the record and accepted the IJ's false determination that Etemadi is not a Christian.

### 1. The prior panel ignored the IJ's factual and legal errors.

The prior panel's fundamental error is its determination that the IJ's finding that Etemadi is not a Christian was supported by substantial evidence. The record is clear that the IJ's finding was *not* supported by substantial evidence. The IJ's analysis was limited to three cursory sentences: "When queried as to the denomination of the Christian religion that [Etemadi] purports to be a member of, this was not answered directly. [Etemadi] stated that he was baptized in the Christian faith prior to the commencement of proceedings. The Court found that this was not true."[2]

---

[2] In relevant part, the prior panel held: "Substantial evidence also supports the IJ's adverse credibility finding regarding Etemadi's conversion to Christianity. Etemadi testified inconsistently regarding the timing of his conversion. He also testified evasively when asked into what Christian denomination he had been baptized. The IJ made a specific finding his testimony was untrue. The IJ also made a general finding that all of Etemadi's testimony was rejected. Etemadi's deliberate and knowing filing of forged documents provided the IJ grounds to discount all of Etemadi's testimony." *Etemadi*, 251 F. App'x at 389. As discussed below, the IJ's and prior panel's conclusion that

The IJ made a material error of fact when he concluded that Etemadi falsely testified that he was baptized prior to the proceedings. At the 2002 hearing, the IJ asked Etemadi when he converted to Christianity. Etemadi testified that he was first introduced to Christianity in 1998 and was baptized after "about a year" of going to church and attending church classes. In support of his testimony, Etemadi presented four documents: his baptism certificate, his statement to amend his CAT claim, a letter from a pastor at his church, and another letter from his church's founding pastor. All four documents state that Etemadi was baptized on October 24, 1999—before Etemadi amended his application to assert a fear of religious persecution as a separate ground for relief. What is more, Etemadi's lawyer also specifically referred to both the founding pastor's letter and the baptism certificate at the hearing. Indeed, the government did not, and does not now, challenge the veracity of these documents. Etemadi has consistently maintained that he was baptized on October 24, 1999. The IJ must make findings based on a "specific cogent reason." *Gui*, 280 F.3d at 1225. At minimum, a "cogent" reason must not be based on a material error of law or fact. The prior panel failed to address this material error of fact. The prior panel clearly erred when it failed to correct or even acknowledge that a primary basis for the IJ's adverse-credibility finding rested on a material error.

The IJ implied, and the prior panel found, that Etemadi deliberately evaded the question at the hearing regarding his Christian denomination. Both the IJ and the prior panel failed to note, however, that Etemadi answered with the

Etemadi testified inconsistently on the timing of his conversion and was evasive on the denomination of his church was clearly erroneous.

name of his church instead of its denomination.**[3]** This is not evidence of evasion, but miscommunication. Nothing in the record—the letters from Etemadi's pastors or his baptism certificate—indicates that Etemadi's church has a denomination. In fact, Etemadi swore in his affidavit that he is a nondenominational Christian, which is consistent with the fact that many evangelical churches are nondenominational. Further, the lawyer questioning Etemadi did not repeat or rephrase the question. When Etemadi gave the name of his church, the lawyer responded, "Okay," and did not request further clarification. Nor did the IJ expressly note that Etemadi acted or spoke evasively. The question—"[w]hat denomination of Christian do you belong to"—was also awkwardly stated. Finally, Etemadi's interpreter appeared to be unfamiliar with theological terms.**[4]** Credibility must be determined in the context of the entire record.

That the IJ based his adverse credibility determination on Etemadi's answer is a clear error of law. "Generalized statements that do not identify specific examples of evasiveness or contradiction in the petitioner's testimony" are insufficient. *Garrovillas v. INS*, 156 F.3d 1010, 1013 (9th Cir. 1998); *see also Kebede v. Ashcroft*, 366 F.3d 808, 811 (9th Cir. 2004) ("[M]inor discrepancies . . . [that] cannot be viewed as attempts by the applicant to enhance h[er] claims of persecution have no bearing on credibility." (quoting

---

**[3]** "[Lawyer:] What denomination of Christian do you belong to? [Etemadi:] There's an Iranian church in Fremont, and I'm a member of that church. [Lawyer:] Do you know what that church is called? [Etemadi:] Iranian Fremont Christian Church. [Lawyer:] Okay."

**[4]** For example, the interpreter did not know the word "divinity" and needed Etemadi's lawyer to translate the word.

*Damaize-Job v. INS*, 787 F.2d 1332, 1337 (9th Cir. 1986) (alterations in original))). Without the IJ providing a specific reason, *Gui*, 280 F.3d at 1225, we cannot see how Etemadi responding with the name of his church rather than an (irrelevant) denomination should be counted against him.

The IJ and the prior panel also failed to address the abundant evidence that Etemadi is a Christian. Etemadi's testimony that he attended church every Sunday and was an active member of his church was corroborated by letters from two of his pastors. The founding pastor's letter stressed that Etemadi is a sincere Christian, baptized in the faith, who attended church services and Bible study and regularly participated in the life of the church. The other pastor's letter also corroborated Etemadi's testimony that he taught in a church class.

The government brushed off Etemadi's conversion testimony, calling it "highly suspect and unconvincing," and implied that Etemadi converted out of cunning instead of conviction. But Etemadi did not hide the fact that his fear of deportation caused him to seek help from a higher power, and that even if he was returned to Iran, he was happy to have converted. That the occasion of Etemadi's conversion was in large part fear of deportation does not necessarily mean his conversion was insincere.

Further, when questioned on Biblical scripture and doctrine, Etemadi testified of a faith unfeigned and demonstrated an understanding of Biblical scripture and doctrine. When the IJ asked Etemadi about the subject of the most recent church class he taught, Etemadi discussed the concept of tithing. And when the IJ also asked Etemadi to name and explain his favorite chapter of the New Testament,

Etemadi responded with a remarkably accurate description of the last chapter of Matthew:

> [Jesus] says that all the powers on the earth and in th[e] skies belong to me. And you have to try to bring together all the nations, and bring them, and baptize in the name of the Father, and the Son, and the Spirit, and try to convince them to apply all the things which I have already (indiscernible) to do. And then I shall be with you until the end of the world.

But the IJ, the BIA, and the prior panel failed to take any of this into account.

The IJ also rejected Etemadi's lawyer's offer to call the pastor to testify in support of Etemadi, although the IJ had earlier asked Etemadi's lawyer if the pastor was available to testify. Etemadi's lawyer then sought a stipulation that Etemadi's faith is sincere, but the government's lawyer refused to so stipulate without being able to cross-examine Etemadi's pastor. This put Etemadi in a very difficult position: unable to call his pastor to testify that he is a sincere Christian, and with the government refusing to stipulate that he is a Christian without his pastor being called as a witness subject to cross-examination.

The IJ ultimately discounted all of Etemadi's claims—including his Christianity-based CAT claim—because of Etemadi's "lack of credibility" in his political-asylum application, which had no relation to his faith. The IJ gave no regard to Etemadi's corroborating documentary evidence and gave his testimony such cursory consideration that it amounted to no consideration at all. The prior panel's

decision affirming the IJ's glaring errors was clearly erroneous.

### 2. The prior panel accepted the IJ's incorrect application of the falsus maxim.

Although the IJ stated he would discount all of Etemadi's *testimony*, he went beyond that to wipe out Etemadi's CAT *claim*. The prior panel held that the IJ properly "discount[ed] all of Etemadi's *testimony*" based on Etemadi's "deliberate and knowing filing of forged documents." *Etemadi*, 251 F. App'x at 389 (emphasis added). The prior panel did not hold that the IJ could discount all of Etemadi's CAT claim. When a claim is based solely on an applicant's testimony, the distinction between testimony and claim is a distinction without a difference. But not here, where significant documentary evidence and third-party testimony corroborates the applicant's claim.

The IJ appears to have relied on the *falsus in uno*, *falsus in omnibus* maxim, which has been upheld by this court in immigration cases. *See, e.g.*, *Enying Li v. Holder*, 738 F.3d 1160 (9th Cir. 2013). Courts use the *falsus* maxim to discount the entirety of a person's testimony—not claim— "based on the logic that . . . if a person testifies falsely, willfully, and materially on one matter, then his 'oath' or word is not 'worth anything' and he is likely to be lying in other respects." *Id*. at 1163 (citing *Cvitkovic v. United States*, 41 F.2d 682, 684 (9th Cir. 1930)); *see id.* at 1164 (stating that the *falsus* maxim "may properly be used to evaluate witness *testimony* in immigration cases" (emphasis added)). The key word is *likely*. The *falsus* maxim is a heuristic that is useful when, in the absence of corroborating evidence, the IJ must decide whether someone who lied about one thing is likely lying about another. But when verifiable corroborating

evidence supports the applicant's testimony, the doubt the maxim is intended to resolve, and the likelihood of deception, are diminished. In such cases, the *falsus* maxim may not be used to wipe out a claim that is corroborated by verifiable documentary evidence or testimony from others.

In many immigration cases, documents and exhibits submitted by applicants are from their native lands and may be difficult to authenticate. When the government timely disputes such evidence and the petitioner has adequate opportunity to respond, IJs have the discretion to disregard that evidence, so long as they give a reasoned explanation. The IJ did not have that discretion here because the government never disputed the authenticity of Etemadi's evidence and the evidence could be readily authenticated. Etemadi's church letters were from a California church with its address, email address, and phone number listed on the letterhead. The church's founding pastor was also willing and ready to testify in support of Etemadi. The IJ ignored the documentary evidence and refused to hear the pastor, over Etemadi's requests. Consequently, the prior panel erroneously accepted the IJ's misinterpretation of the documentary evidence and misapplication of the *falsus* maxim in this case. *See Etemadi*, 251 F. App'x at 389.

The *falsus* maxim invalidates testimony, not other evidence. The cases the dissent cites in opposition to this proposition are hardly on point because they speak to other matters not at issue in this case. *See Cvitkovic*, 41 F.2d at 684 (upholding incorrect jury instruction that *falsus* maxim also applies to unintentional false testimony because the error did not prejudice the defendant); *Cent. Cal. Canneries Co. v. Dunkley Co.*, 247 F. 790, 793 (9th Cir. 1917) ("If Campbell's *testimony* was not true, he was testifying falsely concerning a material and relevant matter, and his *testimony* would for

that reason be wholly rejected.") (emphasis added); *Lopez-Umanzor v. Gonzales*, 405 F.3d 1049, 1059 (9th Cir. 2005) ("We merely hold that the IJ was required to hear testimony from Petitioner's experts in the subject of domestic violence, as to matters pertaining to her credibility.").

Our understanding of the limits of the *falsus* maxim is informed by this court's precedent. In *Guan v. Barr*, the IJ and the BIA disregarded an applicant's CAT claim—also based on his Christian faith—after the IJ made an adverse credibility finding on the applicant's factually distinct political-asylum claim. *Guan v. Barr*, 925 F.3d 1022, 1034 (9th Cir. 2019). We held that "the BIA abused its discretion when it failed to . . . show proper consideration of all factors when weighing equities and denying relief." *Id.* at 1035 (quoting *Kamalthas v. INS*, 251 F.3d 1279, 1284 (9th Cir. 2001)). The *Guan* court distinguished its case from *Farah v. Ashcroft*, in which this court upheld a denial of CAT relief "because the petitioner's CAT claims were based on the same statements [as his asylum claim] with 'no other evidence'" apart from discredited testimony. *Id.* at 1034 (quoting *Farah*, 348 F.3d at 1157). Unlike in *Farah*, the petitioner in *Guan* "offered additional evidence in support of his claim of religion-based torture that neither the BIA nor the IJ addressed." *Id*. at 1034. "In particular, Guan presented country reports indicating that Christians in China are subject to torture, and he presented a letter from a leader of his church in the United States stating that Guan began attending services there in 2014, shortly after he arrived in the United States." *Ibid*. We stressed:

> Thus, even if as a result of the adverse credibility finding the IJ properly rejected Guan's testimony that he participated in religious activities in China and was beaten

> up by the police for it, the unaddressed evidence still supports his CAT claim. It suggests that Guan is currently a practicing Christian and that such individuals face a risk of persecution in China, including torture.

*Ibid.*

The IJ similarly denied Etemadi's religious-conversion CAT claim based on his discredited political-asylum claim. As in *Guan*, the IJ and the BIA erred in failing to address verifiable corroborating evidence that supported Etemadi's CAT claim. But, unlike Guan, who submitted one letter from his church leader, Etemadi submitted much more evidence: a letter from the founding pastor, a letter from another pastor, and his certificate of baptism. *Guan* is clear that an adverse-credibility determination cannot destroy an entire CAT claim. At most, it may be used to invalidate the applicant's *testimony*, but it still requires the IJ to examine corroborating documentary evidence or testimony from another person. The IJ failed to do so here, and the prior panel clearly erred in so affirming.

3. *The prior panel accepted the IJ's violation of Kamalthas v. INS.*

In *Kamalthas v. INS*, we held that a Sri Lankan Tamil applicant's adverse credibility finding for an "asylum claim does not necessarily preclude relief under the Convention Against Torture." *Kamalthas*, 251 F.3d at 1280. We relied on *Mansour v. INS*, 230 F.3d 902 (7th Cir. 2000), in which the Seventh Circuit found that the BIA had abused its discretion for having "only addressed the Convention claim 'in a minimalistic and non-detailed manner,' and had overrelied on its adverse credibility determination in the

asylum context, which 'seem[ed] to overshadow its analysis of [Iraqi applicant] Mansour's torture claim.'" *Kamalthas*, 251 F.3d at 1283 (quoting *Mansour*, 230 F.3d at 908). In reversing the BIA and remanding, we concluded that we could not "allow[] a negative credibility determination in the asylum context to wash over the torture claim; especially when the prior adverse credibility determination is not necessarily significant in this situation." *Id*. at 1284 (quoting *Mansour*, 230 F.3d at 908).

The IJ's three-sentence analysis of Etemadi's CAT claim was likewise minimal, non-detailed, and overshadowed by the analysis of Etemadi's political-asylum claim. *See id.* at 1283. Etemadi's asylum and CAT claims are grounded in different facts: His asylum claim was based on his asserted political opinion and his CAT claim is based on his Christian faith. And worse than in *Kamalthas* and *Mansor*, the IJ's adverse-credibility determination was based on a material error of fact that Etemadi lied about the timing of his baptism. This error clearly "indicates [the IJ's] failure to consider all the evidence." *Cole v. Holder*, 659 F.3d 762, 771 (9th Cir. 2011). "[W]here there is any indication that the BIA did not consider all of the evidence before it . . . the decision cannot stand. Such indications include misstating the record and failing to mention highly probative or potentially dispositive evidence." *Id.* at 771–72.

Here, the IJ ignored the documentary evidence corroborating Etemadi's claim of Christian conversion. "The agency abuses its discretion if it fails to state its reasons and show proper consideration of all factors when weighing equities and denying relief." *Yepes-Prado v. INS*, 10 F.3d 1363, 1366 (9th Cir. 1993) (citing *Cerrillo-Perez v. INS*, 809 F.2d 1419, 1422 (9th Cir. 1987)). "[W]e cannot assume that the [agency] considered factors that it failed to

mention." *Id.* at 1366 (citing *Mattis v. INS*, 774 F.2d 965, 967 (9th Cir. 1985)). The IJ did precisely what *Kamalthas* (and *Guan*) prohibit: The IJ used an adverse credibility finding for an asylum claim to "wash over" Etemadi's CAT claim and failed to consider the evidence and all factors in Etemadi's favor. *Kamalthas*, 251 F.3d at 1284.

## B. Documents Required in Etemadi's Motion to Reopen Proceedings

When the BIA denied Etemadi's motion to reopen, the first reason it gave was that Etemadi "has not submitted an application for relief" as required by 8 C.F.R. § 1003.2(c)(1). This court has reviewed the BIA's interpretation of this regulation under the abuse-of-discretion standard. *See Aliyev v. Barr*, 971 F.3d 1085, 1086–87 (9th Cir. 2020). However, the interpretation of a regulation or statute is a legal question, and we review legal questions *de novo*. *See Ayala v. Sessions*, 855 F.3d 1012, 1020 (9th Cir. 2017); *see also Alali-Amin*, 523 F.3d 1041 ("A denial of a motion to reopen immigration proceedings is generally reviewed for abuse of discretion; however, where, as here, the issue presented is a 'purely legal question,' a *de novo* standard applies.") (quoting *Cano-Merida*, 311 F.3d at 964. Further, we need not defer to the BIA's interpretation of § 1003.2(c)(1) because, among other reasons, there is no indication that its interpretation of the regulation in its unpublished decision is "the agency's 'authoritative' or 'official position.'" *Kisor v. Wilkie*, 139 S. Ct. 2400, 2416 (2019). The BIA cited only to the text of the regulation. Because the question of whether Etemadi submitted the "appropriate application for relief" turns on how to interpret the text of § 1003.2(c)(1)—a legal question—the appropriate standard of review is *de novo*.

The government argues that Etemadi has "waived" any challenge to the BIA's decision because he did not discuss this regulation in his opening brief. The government probably means that Etemadi has *forfeited* any challenge to the BIA's decision on this issue. Although "waiver" and "forfeiture" are often used to mean the same thing, they are different. As this court recently clarified, "[f]orfeiture is the failure to make a timely assertion of a right, whereas waiver is the intentional relinquishment or abandonment of a known right." *Claiborne v. Blauser*, 934 F.3d 885, 893 (9th Cir. 2019) (quoting *United States v. Perez*, 116 F.3d 840, 845 (9th Cir. 1997) (en banc)); *see also United States v. Montgomery*, 998 F.3d 693, 697–98 (6th Cir. 2021).

The government cites only one case in support of its waiver argument, *Lopez-Vasquez v. Holder*, 706 F.3d 1072, 1079–80 (9th Cir. 2013). However, the government fails to note that *Lopez-Vasquez* relied on *Koerner v. Grigas*, 328 F.3d 1039 (9th Cir. 2003), which explicitly discussed this court's longstanding exceptions to the general rule that we will not review an issue not presented in an opening brief.

> First, we will review an issue not present in an opening brief for "good cause shown", [sic] Fed. R. App. P. 2, or "if a failure to do so would result in manifest injustice." *United States v. Loya,* 807 F.2d 1483, 1487 (9th Cir. 1987). Second, "[w]e have discretion to review an issue not raised by appellant . . . when it is raised in the appellee's brief." *In re Riverside–Linden Investment Co.,* 945 F.2d 320, 324 (9th Cir. 1991). Third, we may review an issue if the failure to raise the issue properly did not prejudice the defense of the opposing party.

*Grigas*, 328 F.3d at 1049 (quoting *United States v. Ullah*, 976 F.2d 509, 514 (9th Cir. 1992)).

All three exceptions to the waiver rule apply here. As discussed, to deport Etemadi without a hearing conducted according to the requirements of the law would work a manifest injustice against him. The second exception applies because the issue was raised in the government's appellee brief. The Government did not rely only on "waiver" but did interpret both the BIA decision and § 1003.2(c)(1) to "quite reasonably" require Etemadi to submit a new application because the agency and prior panel originally found that Etemadi is not a Christian. The third exception also applies because there is no reason to believe—nor does the government argue—that the government was prejudiced by Etemadi's failure to raise the issue.

The text of § 1003.2(c)(1) makes a clear distinction between a motion to reopen proceedings and a motion to reopen proceedings for the purpose of submitting an application for relief:

> A motion to reopen proceedings shall state the new facts that will be proven at a hearing to be held if the motion is granted and shall be supported by affidavits or other evidentiary material. A motion to reopen proceedings *for the purpose of submitting an application for relief* must be accompanied by the appropriate application for relief and all supporting documentation.

8 C.F.R. § 1003.2(c)(1) (emphasis added).

The first of these—a standard motion to reopen—need only state the new facts that will be proven at the hearing and

supporting evidentiary material. Under this standard, Etemadi has satisfied the requirements of the regulation.[5] But a motion to reopen proceedings *for the purpose of submitting an application for relief* must meet the additional requirement of attaching "the appropriate application for relief." *Ibid.*

The unambiguous language of § 1003.2(c)(1) describes two kinds of motions to reopen. We do not now create a "circuit split" because this issue has not been squarely addressed by any other circuit. Nearly all the cases the dissent cites can be easily distinguished from Etemadi's case because the petitioners raised a different claim on the motion to reopen that they had not raised earlier. *Bi Feng Liu v. Holder*, 560 F.3d 485, 487 (6th Cir. 2009), involved an immigrant who, after having been denied asylum on grounds related to China's one-child policy, moved to reopen based on his later-acquired political affiliation in the China Democratic Party in New York. In *Palma-Mazariegos v. Keisler*, 504 F.3d 144, 147 (1st Cir. 2007), the petitioner was originally denied relief and then filed a motion to reopen on new grounds—his motion to adjust status. Similarly, *In re Yewondwosen*, 21 I. & N. Dec. 1025 (BIA 1997), involved a petitioner who was originally denied relief but later moved to "pursue an application of adjustment of status" "during the pendency of her appeal." *See also Lin Xing Jiang v. Holder*, 639 F.3d 751, 754 (7th Cir. 2011) (stressing that, in

---

[5] Etemadi submitted (1) a declaration that he converted to Christianity in 1999 and will be subject to torture in Iran for his faith; (2) a psychologist's evaluation of Etemadi's wife, finding that she "would suffer extreme hardship were her husband not allowed to remain in this country . . . ."; (3) a 2017 publication of the Austrian Red Cross on persecution of Christians in Iran, which contains excerpts of other reports; and (4) the State Department's 2016 International Religious Freedom Report for Iran.

the petitioner's motion to reopen, "[f]or the first time, [the petitioner] argued that she feared persecution based on her Catholic religion"). By contrast, Etemadi's 2018 motion to reopen is on the same basis as the application he submitted in 2000: his Christian faith.

The case that comes closest to ours is *Gen Lin v. Attorney General*, 700 F.3d 683 (3d Cir. 2012). But it too can be distinguished from Etemadi's case because Lin's asylum claim was originally denied on two distinct grounds: on "Lin's failure to file his petition for asylum within one year of his arrival, and on an adverse credibility determination." *Id.* at 685. However, Lin's motion to reopen only challenged the IJ's credibility determination. In other words, Lin knew or should have known that, regardless of his challenge to the IJ's credibility finding, his original claim had been denied on an independent ground that he did not challenge—his failure to file his petition on time. By contrast, here there is no independent and unchallenged ground that defeated Etemadi's CAT claim.

The regulation's plain language makes it hard to see how Etemadi's motion to reopen his previous CAT claim based on Christianity was in any way "for the purpose of submitting an application for relief" rather than a regular motion to reopen his original CAT claim. 8 C.F.R. § 1003.2(c)(1). Etemadi had already submitted his application for relief before the IJ, and his application asserting his religious-persecution claim is in the administrative record. Etemadi referred to it repeatedly in his motion to reopen. Indeed, the CAT relief he sought in his motion to reopen is identical to the relief he sought at the hearing, and on the same grounds of his Christian faith. He was required to do no more.

We also need not defer to the BIA's interpretation of § 1003.2(c)(1) because there is no indication that BIA's interpretation of the regulation is "the agency's 'authoritative' or 'official' position, rather than any more ad hoc statement not reflecting the agency's views." *Kisor*, 139 S. Ct. at 2416. But even if the BIA's interpretation were considered representative of the agency's official views, the regulation is not genuinely ambiguous. *Id*. at 2415 ("First and foremost, a court should not afford *Auer* deference unless the regulation is genuinely ambiguous. . . . And before concluding that a rule is genuinely ambiguous, a court must exhaust all the 'traditional tools' of construction."). We see no ambiguity. There are two kinds of motions to reopen, and those that are "for the purpose of submitting an application for relief" require an attachment of the "appropriate application." The other kind does not. Finally, adopting the BIA's presumption and allowing it to defeat Etemadi's claim without examining it would create "unfair surprise" and lack "fair warning," *id.* at 2418, to Etemadi because it would require him to submit an application that the agency already has.

## C. Changed Country Conditions

In his motion to reopen, Etemadi filed an affidavit that he is a Christian. The BIA denied Etemadi's motion to reopen as untimely "to the extent [he] [sought] reconsideration" of the IJ's determination that Etemadi is not a Christian. But "[t]he Board is required to accept as true the facts stated in [Etemadi's] affidavit unless they are inherently unbelievable." *Najmabadi v. Holder*, 597 F.3d 983, 990 (9th Cir. 2010) (citing *Limsico v. INS*, 951 F.2d 210, 213 (9th Cir. 1991)); *see also Sakhavat v. INS*, 796 F.2d 1201, 1204 (9th Cir. 1986) ("[W]e hold that '[t]he BIA abused its discretion . . . when it disbelieved affidavit

evidence that was not inherently incredible." (quoting *Mattis*, 774 F.2d at 969)). An exception to this rule applies when the affidavit is contradicted by findings below that are "supported by substantial evidence." *Limsico*, 951 F.2d at 213 (quoting *Elias-Zacarias v. INS*, 921 F.2d 844, 854 (9th Cir. 1990), *rev'd on other grounds*, 502 U.S. 478 (1992)). In *Limsico*, the petitioner's affidavit that he had good character was contradicted by his own testimony that he paid an American citizen to marry him so that he could get a green card. *Id.* at 213–14. The government does not present—and we are not aware of—any such testimony or evidence that contradicts Etemadi's claim that he is a Christian. Because the IJ, the BIA, and the prior panel's findings that Etemadi was not a Christian were not supported by substantial evidence, this exception does not apply. Further, "[t]o determine whether [Etemadi] has established a prima facie case, the Board must look at the evidence in its entirety." *Id.* at 213. The BIA failed to do so.

The BIA abused its discretion in its conclusory analysis that the evidence Etemadi submitted with his motion to reopen failed to show changed country conditions in Iran. "The agency abuses its discretion if it fails to state its reasons and show proper consideration of all factors when weighing equities and denying relief." *Yepes-Prado*, 10 F.3d at 1366 (citing *Cerrillo-Perez*, 809 F.2d at 1422); *see also Chandra v. Holder*, 751 F.3d 1034, 1039 (9th Cir. 2014) (requiring that the BIA give full consideration to all factors, both favorable and unfavorable, on a motion to reopen); *Yan Rong Zhao v. Holder*, 728 F.3d 1144, 1149 (9th Cir. 2013) (remanding to the BIA where the BIA entirely failed to address petitioner's supplemental brief and the evidence attached to it; although the BIA had discretion whether to consider the evidence, it was legal error for it to fail entirely to exercise its discretion). The BIA concluded that Etemadi

"has not demonstrated that Iran's treatment of Christians has worsened since the Immigration Judge's hearing. Rather, Iran's treatment of Christians is a continuation of those conditions presented at the Immigration Judge's hearing." But we "cannot assume that the [agency] considered factors that it failed to mention." *Yepes-Prado*, 10 F.3d at 1366 (citing *Mattis*, 774 F.2d at 967). Although the BIA correctly noted that the punishment for apostasy was the same then as it is now, the BIA's passing reference to the country-conditions reports Etemadi submitted at his original hearing and on his motion to reopen "fails to state its reasons and show proper consideration of *all* factors when weighing equities and denying relief." *Id.* at 1366 (emphasis added).

"[T]he changed country conditions exception is concerned with two points in time: the circumstances of the country at the time of the petitioner's previous hearing, and those at the time of the motion to reopen." *Salim v. Lynch*, 831 F.3d 1133, 1137 (9th Cir. 2016). A petitioner need not prove that the changed conditions are unprecedented. Changes in country conditions are still changes even if they began in intervening years. Because the changed-country-conditions exception "is concerned with two points in time," *ibid.*, the petitioner need only show that country conditions are worse at the time of the motion to reopen than at the last hearing. *See, e.g.*, *Chandra*, 751 F.3d at 1039 ("The BIA abused its discretion when it failed to assess Chandra's evidence that treatment of Christians in Indonesia had deteriorated since his 2002 removal hearing."). This is done by comparing the evidence submitted for the original hearing with the evidence submitted at the motion to reopen.

"The newly submitted evidence must be 'qualitatively different' from the evidence presented at the previous hearing." *Agonafer v. Sessions*, 859 F.3d 1198, 1204 (9th

Cir. 2017) (quoting *Malty v. Ashcroft*, 381 F.3d 942, 945 (9th Cir. 2004)). "Evidence that simply recounts previous conditions presented at a previous hearing or that is voluminous but redundant is not sufficient to show a change in country conditions." *Id.* at 1204. Repeated evidence should not be confused with evidence of repeated offenses. For example, one credible report that a pastor was arrested is not better than ten reporting the same arrest. But reports that many more pastors have been arrested now than in the past would demonstrate a qualitative difference in country conditions. A significant quantitative difference *is* a qualitative difference.

The BIA failed to address compelling evidence that Etemadi submitted in his motion to reopen that conditions have become qualitatively worse for Christians in Iran. A careful comparison of the evidence Etemadi submitted prior to his 2002 hearing and on his 2018 motion to reopen, show that, as the Danish Immigration Service noted in 2014, there have been "major recent changes in Iran when it comes to conditions for Christians." This evidence was not available to Etemadi because the changes in country conditions occurred after the IJ's original deportation order.

For instance, there has been a proliferation of clandestine "house churches" because of the significant government pressure on official churches. As the Austrian Red Cross report in the record notes, in "2012, Iran's government began to bar converts from Muslim backgrounds from attending services in official churches." In 2010, "the Iranian National Security Council . . . made a decision to stop Farsi-speaking churches. In late 2010 and early 2011, the demands against the churches started and finally in 2013 the largest remaining churches were shut down." The task to shut down Farsi-speaking churches was assigned "to the Special Intelligence

Branch of the Revolutionary Guard which has taken charge of dealing with Iranian Farsi speaking churches and converts to Christianity." As the State Department notes in its 2016 International Religious Freedom Report, "the [Iranian] government, through such pressure and through church closures, had eliminated in recent years all but a handful of Farsi-language church services." Most notable was the complete shutdown in 2013 of the Central Assemblies of God Church in Tehran, Iran's largest evangelical church, and the arrest of its pastor. A report by the Danish Immigration Service concluded, "[T]here are essentially no churches offering services in Farsi over ground anymore."

The State Department's 2015 International Religious Freedom Report notes that "the [Iranian] government prevented ordination of new ministers." The Danish report states that one of the only Farsi-speaking evangelical churches remaining, in the "more liberal" area of Rasht, has stopped allowing new members into its church. Etemadi's original country-conditions reports do not mention government prevention of the ordination of new ministers or acceptance of new members.

The State Department's 2016 International Religious Freedom Report notes that the Iranian government "arrested 17 Christians who were attending a private social event in Tehran. Following this incident, attendees of the event were reportedly subjected to interrogations and intimidation and had their private property seized." In addition, "[t]wo attendees were reportedly banned from continuing their university studies for engaging in 'illegal activities' while other attendees lost their jobs." This is another qualitative change in the conditions in Iran. Etemadi's previously submitted reports discussed arrests of pastors, as well as ordinary Christians during religious activities. Those reports

did not note that the government would arrest Christians at *social* events, or that social events would be deemed "illegal activities" based on the religious status of its attendees. Nor did Etemadi's original reports discuss that Christian students would be expelled from university or lose their livelihoods. That Christians face the threat of arrest even outside of religious activities greatly increases their risk of persecution, arbitrary arrest, and torture. Similarly, the United States Commission on International Religious Freedom's ("USCIRF") 2016 report noted a "significant increase in the number of physical assaults and beatings of Christians in prison." The BIA ignored all of this.

The USCIRF 2016 report described that the Iranian government has continuously and systematically arrested Christians in their homes, and has "[s]ince 2010, . . . arbitrarily arrested and detained more than 550 Christians throughout the country. As of February 2016, approximately 90 Christians were either in prison, detained, or awaiting trial because of their religious beliefs and activities." Etemadi's reports also note that "Christians who were arrested were reportedly subject to severe physical and psychological mistreatment" and that prison officials withhold medical care from Christian prisoners.

There were, of course, house churches in Iran before 2002 and one report by a Christian nonprofit that Etemadi submitted in 2002 noted that the government persecuted at least some of them. But the State Department Report Etemadi submitted in 2002 did not discuss any persecution of house churches, and the report by the Christian nonprofit noted that the persecution was intermittent and occurred in "waves" ("The persecution of Evangelical Christians occurs in waves of attacks."), rather than what is reported now: a systematic, continuous, and "widening gyre of persecution."

*Aviles-Torres v. INS*, 790 F.2d 1433, 1435 (9th Cir. 1986). This is a qualitatively different kind of persecution that the BIA failed to address.

Etemadi has demonstrated prima facie evidence for relief under CAT. *See, e.g.*, *Ramirez-Munoz v. Lynch*, 816 F.3d 1226, 1228 (9th Cir. 2016). A prima facie case is established "where the evidence reveals a reasonable likelihood the statutory requirements for relief have been satisfied." *Mendez-Gutierrez v. Gonzales*, 444 F.3d 1168, 1171 (9th Cir. 2006) (quoting *Ordonez v. INS*, 345 F.3d 777, 785 (9th Cir. 2003)). In order to establish a prima facie claim, the law does "not require[] a conclusive showing that, assuming the facts alleged to be true, eligibility for relief has been established." *Tadevosyan v. Holder*, 743 F.3d 1250, 1255 (9th Cir. 2014) (quoting *In re L-O-G-*, 21 I. & N. Dec. 413, 418–19 (BIA 1996)). Etemadi's country-conditions evidence sufficiently documents the widespread persecution of Christian converts and torture[6] of Christian prisoners in Iran to establish a prima facie claim for CAT relief, and thus requires remand.

## CONCLUSION

The record compels us to conclude that the IJ's finding that Etemadi is not a Christian was unsupported by substantial evidence. The IJ improperly allowed his negative determination of Etemadi's credibility, based primarily on

---

[6] For example, a 1997 State Department report in the record noted "extrajudicial killings and summary executions; widespread use of torture and other degrading treatment; disappearances; arbitrary arrest and detention; lack of fair trials; [and] harsh prison conditions," and the USCIRF 2016 report documented that "human rights groups inside Iran reported a significant increase in the number of physical assaults and beatings of Christians in prison."

Etemadi's frivolous political asylum claim, to wash over Etemadi's legitimate religion-based CAT claim. The BIA, and a subsequent panel of our court, relied on this error and denied Etemadi proper consideration of this claim. Etemadi has demonstrated changed country conditions in Iran and has also made a prima facie showing of entitlement to CAT relief. We therefore **GRANT** the petition for review and **REMAND** for a new hearing to consider all evidence of Etemadi's Christian faith and whether Etemadi is more likely than not to face torture if removed to Iran.

M. SMITH, Circuit Judge, dissenting:

This should be a straightforward case. Nearly twenty years ago, an immigration judge (IJ) ordered Kami Etemadi removed, having concluded that Etemadi did not make the required showing to be granted asylum or relief pursuant to the Convention Against Torture (CAT). The Board of Immigration Appeals (BIA) affirmed that decision. In 2007, we affirmed the BIA. *See Etemadi v. Keisler*, 251 F. App'x 388 (9th Cir. 2007). Sixteen years after the IJ denied relief, Etemadi asked the BIA to reopen his case, and the BIA declined to exercise its discretion to do so. Based on the fact that we already affirmed the IJ's removal order and that we generally defer to the BIA on motions to reopen, the BIA's decision should have been the end of the matter.

The majority now concludes that Etemadi should have a second bite at the apple. In doing so, the majority jumps over not one, not two, but *three* legal hurdles. First, the majority disregards the law of the case doctrine. Second, the majority excuses waiver and proceeds to overrule the BIA's interpretation of a regulation, thereby creating a circuit split

on an issue that was not even briefed. And third, the majority incorrectly holds that the BIA abused its discretion with regard to changed country conditions in Iran. The existence of any one of these hurdles should be sufficient to deny Etemadi's petition for review, yet the majority somehow leaps over each and every one of them. I would not normally undertake the exhaustive review below of what I consider to be the majority's errors, but the result of the majority's decision is, in my view, so non-sensical, and so contrary to so many of our precedents, that I feel I have no choice but to undertake the task. I respectfully dissent.

## I. Law of the Case Doctrine

Adjudicating Etemadi's original application for relief, the IJ first determined that Etemadi did not testify credibly. With regard to evidence of Etemadi's purported Christian faith, the IJ wrote:

> When queried as to the denomination of the Christian religion that he purports to be a member of, this was not answered directly. He stated that he was baptized in the Christian faith prior to the commencement of proceedings. The [Immigration] Court found that this was not true.

But the IJ found numerous other reasons to make an adverse credibility finding: Etemadi submitted false documents, with the IJ determining that Etemadi "knew that the documents he offered were false at the time [they were] filed and offered;" Etemadi knowingly made "misrepresentations that were material" regarding his family in Iran; and Etemadi did not recant his false testimony or forged documents. The IJ considered Etemadi to be so incredible that he deemed

Etemadi's application to be frivolous. For those reasons, the IJ "believe[d] it appropriate to discount all testimony offered by" Etemadi.

After explaining why he made an adverse credibility finding, the IJ then turned to the merits of Etemadi's application, holding that Etemadi had not made the required showings for asylum or withholding of removal. The IJ denied Etemadi's application for CAT relief as well. The IJ concluded that Etemadi's "application for relief under Article 3 of the Convention Against Torture is likewise denied on the basis . . . of a lack of credibility as set forth in the credibility findings above." The BIA summarily affirmed the IJ's decision.

Upon appeal to our court, our prior panel first evaluated the IJ's credibility finding. We held that "[s]ubstantial evidence . . . support[ed] the IJ's adverse credibility finding regarding Etemadi's conversion to Christianity." *Etemadi*, 251 F. App'x at 389. We specifically highlighted that Etemadi "testified inconsistently," "testified evasively," and filed "forged documents." *Id.* Based on these "forgeries and inconsistencies," which went "to the heart of Etemadi's asylum claim," we affirmed the IJ's decision to deny asylum and withholding of removal. *Id.*

We then separately evaluated Etemadi's CAT claim, writing that "[i]t was precisely the falsity of [Etemadi's] claim of Christian conversion which invalidated his CAT claim." *Id.* at 390. This was because Etemadi's CAT claim was based *entirely* on his claim of Christian conversion. *See id.* ("Etemadi claimed he would be tortured only because of his Christian conversion."). Thus, although "[a]n adverse credibility determination is not necessarily a death knell to

CAT protection" in general, *Shrestha v. Holder*, 590 F.3d 1034, 1048 (9th Cir. 2010), in this case, it was.

## A. Applicability of the Law of the Case Doctrine

The majority first questions whether the law of the case doctrine should even apply to this case. The majority writes: "Because the law-of-the-case doctrine applies to legal issues, and because the prior panel decided a facts-predominant mixed question of law and fact, the law-of-the-case doctrine likely does not apply here at all." Majority Opinion at 12.

At times we have stated that the law of the case doctrine applies to "legal issue[s]." *See, e.g.*, *In re Rainbow Magazine*, 77 F.3d 278, 281 (9th Cir. 1996). But we have also stated that "under the 'law of the case' doctrine one panel of an appellate court will not as a general rule reconsider questions which another panel has decided on a prior appeal in the same case," without restricting the doctrine to "legal issues" or denying the applicability of the doctrine to mixed questions of law and fact. *Kimball v. Callahan*, 590 F.2d 768, 771 (9th Cir. 1979); *cf. United States v. Hollis*, 506 F.3d 415, 421 (5th Cir. 2007) ("On this second appeal, we are bound by the law of the case rule: ordinarily an issue of fact or law decided on appeal may not be reexamined by the appellate court on subsequent appeal." (internal quotation marks and modifications omitted)).

In any event, when deciding whether the law of the case doctrine applies to this matter, we are not determining whether we should overrule the IJ's adverse credibility determination, but instead whether we should overrule the prior panel's affirmance of that adverse credibility determination. The prior panel's ruling is based on application of the substantial evidence standard to the IJ's

factfinding. "The phrase 'substantial evidence' is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citation omitted). Application of the substantial evidence standard does not involve actual factfinding (taking testimony, weighing evidence, etc.), which is left to the agency, but is instead a legal determination as to whether those facts meet the legal bar of substantial evidence. *See id.* at 1161 (Gorsuch, J., dissenting) ("All of the relevant facts are undisputed, and it remains only to decide the legal question whether they meet the substantial evidence standard."); *cf. Blumenthal Distrib., Inc. v. Herman Miller, Inc.*, 963 F.3d 859, 871 (9th Cir. 2020) ("[T]he legal question before us is whether HM offered evidence sufficient to allow a reasonable jury to conclude that the EAMES trade dress met the definition of fame."); *Stein v. United States*, 337 F.2d 14, 16 (9th Cir. 1964) ("The sole legal question raised on this appeal is the sufficiency of the evidence to prove the crimes charged."). In applying the substantial evidence standard, we "must not weigh the evidence." *SEC v. Todd*, 642 F.3d 1207, 1215 (9th Cir. 2011); *see also Donchev v. Mukasey*, 553 F.3d 1206, 1213 n.7 (9th Cir. 2009) ("This independent weighing of the testimony is what we are not permitted to do."). As this precedent confirms, application of the substantial evidence standard by the prior panel was a legal question, even if it did involve an analysis of the IJ's factual determinations.

The majority does not address this precedent. Instead, the majority incorrectly contends that "[t]he dispute among the parties" in the prior appeal "primarily concerned the weight of the evidence regarding the agency's determination that Etemadi is not a Christian." Majority Opinion at 11; *but see Todd*, 642 F.3d at 1215. I agree that "[w]hen a mixed question of law and fact is presented, the standard of review

turns on whether factual matters or legal matters predominate." Majority Opinion at 11 (quoting *United States v. Mateo-Mendez*, 215 F.3d 1039, 1042 (9th Cir. 2000) (internal quotation marks omitted)). But the law of the case doctrine is not a "standard of review." It is instead a "practice of courts generally to refuse to reopen what has been decided." *Messenger v. Anderson*, 225 U.S. 436, 444 (1912). We are not deciding which standard of review should apply to the prior panel's disposition, but instead whether we should afford that disposition the respect warranted pursuant to the law of the case doctrine.

The majority appears to argue that because the prior panel's standard of review involved a mixed question of law and fact, the law of the case doctrine should not apply. The majority cites no case law, either from our court or any other court, for this proposition. As noted above, we have pronounced that the law of the case doctrine pertains to "questions which another panel has decided on a prior appeal." *Kimball*, 590 F.3d at 771. And both our court and other courts, albeit in unpublished dispositions, have applied the law of the case doctrine to prior panels' application of the substantial evidence standard for IJ credibility determinations. *See, e.g.*, *Kaur v. Holder*, 470 F. App'x 611, 612 (9th Cir. 2012) (applying the law of the case doctrine and "declin[ing] to reconsider [a petitioner's] challenge to the immigration judge's adverse credibility determination because this court already decided the issue in" a prior appeal).[1] Accordingly, the prior panel's determination that

---

[1] *See also Ceni v. Mukasey*, 291 F. App'x 454, 456 n.1 (2d Cir. 2008) ("In any event, this Court has previously considered the BIA's affirmance of the IJ's adverse credibility determination and found that it was supported by substantial evidence. Thus, that adverse credibility

the evidence before the IJ was substantial is subject to the law of the case doctrine.

## B. Substantial Evidence and Clear Error

On direct appeal, we review an "adverse credibility finding for substantial evidence." *Soto-Olarte v. Holder*, 555 F.3d 1089, 1091 (9th Cir. 2009). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, [the Supreme] Court has said, is 'more than a mere scintilla.'" *Biestek*, 139 S. Ct. at 1154 (citation omitted). The review of an IJ's credibility determination and evaluation of a CAT application is "extremely deferential: 'administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Farah v. Ashcroft*, 348 F.3d 1153, 1156 (9th Cir. 2003) (quoting 8 U.S.C. § 1252(b)(4)(A)–(B) (1996)). "Thus, when a petitioner contends that the IJ's findings are erroneous, the petitioner 'must establish that the evidence not only *supports* that conclusion, but *compels* it.'" *Id.* (quoting *Singh v. INS*, 134 F.3d 962, 966 (9th Cir. 1998)). "Under this standard, only the most extraordinary circumstances will justify overturning an adverse credibility determination." *Iman v. Barr*, 972 F.3d 1058, 1064 (9th Cir. 2020) (citation and internal quotation marks omitted).

---

determination remains the law of the case."); *Fui Ha Bong v. Mukasey*, 287 F. App'x 955, 955–56 (2d Cir. 2008) ("In this Court's summary order resolving [the prior] petition, we decided that both the IJ's past persecution and well-founded fear findings were supported by substantial evidence. That decision remains the law of the case." (citation omitted)); *Portillo-Sierra v. U.S. Att'y Gen.*, 270 F. App'x 859, 861 (11th Cir. 2008) ("[W]e upheld the adverse credibility findings [in a prior appeal]. . . . [O]ur prior holding has become the law of the case.")

As the majority acknowledges, "[a]ccording to the [law of the case] doctrine, . . . a prior decision should be followed unless . . . the decision is clearly erroneous and its enforcement would work a manifest injustice." *Alaimalo v. United States*, 645 F.3d 1042, 1049 (9th Cir. 2011); *see* Majority Opinion at 11. "[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985) (citation and some internal quotation marks omitted). We cannot "reverse the finding of" the previous panel "simply because [we are] convinced that [we] would have decided the case differently." *Id.*

Thus, when we revisit a prior panel's affirmance of an IJ's factual determination, our standard of review is doubly deferential. We must determine whether the prior panel clearly erred in holding that substantial evidence supported the IJ's adverse credibility finding. Put another way, we must be "left with the definite and firm conviction," *id.*, that "any reasonable adjudicator would be compelled to conclude," *Farah*, 348 F.3d at 1156 (internal quotation marks omitted), that the IJ's credibility determination did not meet the low bar of "more than a scintilla, but less than a preponderance" of the evidence, *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citations and internal quotation marks omitted). Given that our normal review of a credibility determination is already "*extremely* deferential," *Farah*, 348 F.3d at 1156 (emphasis added), it is difficult to even summon an adverb that describes the level of deference for overruling a prior panel on a substantial evidence determination.

The majority misunderstands the standard of review that we are required to apply in this case. The majority contends that "[a] prior panel's incorrect determination that an IJ's decision was supported by substantial evidence is necessarily clear error because" the substantial evidence standard is more deferential than the clear error standard. Majority Opinion at 13 n.1. Application of the two standards is not an either-or question. Instead, it is sequential. The first panel asked whether there was substantial evidence to support the IJ's credibility determination. *See Etemadi*, 251 F. App'x at 389. We now ask whether it was clear error for the prior panel to make that substantial evidence determination. That is because clear error review examines whether "a *finding* is 'clearly erroneous.'" *Anderson*, 470 U.S. at 573 (emphasis added). The prior panel's "finding" (or, in this case, holding) was not whether Etemadi was or was not a Christian. Instead, it was whether there was substantial evidence to support the IJ's credibility determination. Thus, we do not weigh the two standards of review against one another. We must apply both standards and resolve whether it was clear error to hold that there was substantial evidence to support the IJ's credibility determination.

Despite mischaracterizing the standard of review, the majority decides that the prior panel did commit "clear error." *See* Majority Opinion at 12–24. Were we reviewing the IJ's adverse credibility determination under de novo review, or even on direct appeal pursuant to a substantial evidence standard, a reversal of the adverse credibility determination might be defensible, but since we are governed by the doubly deferential standard of substantial evidence *and* clear error, I cannot join the majority's analysis or conclusion.

### 1. Substantial Evidence for the IJ's Credibility Determination

The majority concludes that "[t]he IJ made a material error of fact when he concluded that Etemadi falsely testified that he was baptized prior to the proceedings." Majority Opinion at 15. The majority highlights that Etemadi submitted a number of documents showing his conversion to Christianity before he amended his asylum and CAT applications to include a religious persecution claim. *See id.* at 15. The IJ listed most, if not all, of these documents in his decision, and wrote that Etemadi "did submit documentation in support of his application for asylum."

The majority faults the IJ for finding Etemadi's claim of Christian conversion to be false because the IJ stated: "When queried as to the denomination of the Christian religion that [Etemadi] purports to be a member of, this was not answered directly. [Etemadi] stated that he was baptized in the Christian faith prior to the commencement of proceedings. The [Immigration] Court found that this was not true." *See* Majority Opinion at 14. The majority correctly notes that Etemadi claimed to have been baptized on October 24, 1999, both based on his testimony and documents submitted in support of his asylum application, including a baptismal certificate and a letter from a pastor. *See id.* at 15. Thus, I agree that the IJ technically erred in writing that Etemadi falsely claimed to have been baptized prior to the start of proceedings, as Etemadi submitted his original asylum application in October 1996.

The question, however, in determining whether we should disregard the law of the case doctrine is not whether the *IJ* erred, but instead whether our *prior panel* clearly erred in determining that there was substantial evidence to affirm

the IJ's adverse credibility finding.  Our prior panel never mentioned the date of Etemadi's baptism, nor did it cite the IJ's erroneous statement.  *See Etemadi*, 251 F. App'x at 389–90.[2]  The majority essentially faults our prior panel for not pointing out an error made by the IJ, when there is no indication that the prior panel ever actually relied on that error.  One wonders how the majority can be "left with the definite and firm conviction that a mistake has been committed" by the prior panel when the prior panel never stated that it relied on the IJ's error.  *Anderson*, 470 U.S. at 573; *cf. Perez-Arceo v. Lynch*, 821 F3d 1178, 1185 (9th Cir. 2016) (upholding an adverse credibility determination even though "the IJ erred in . . . three respects").

Next, the majority states that the prior panel erred by upholding a finding "that Etemadi deliberately evaded the question at the hearing regarding his Christian denomination."  Majority Opinion at 15.  The prior panel did rely on this finding.  *See Etemadi*, 251 F. App'x at 389 ("[Etemadi] also testified evasively when asked into what Christian denomination he had been baptized.").  The relevant portion of the testimony is:[3]

---

[2] The prior panel did write that "[t]he IJ made a specific finding [that Etemadi's] testimony was untrue." *Etemadi*, 251 F. App'x at 389. While this could be referring to the baptism date, the prior panel never stated as much, which does not meet the high bar of clear error, especially as the IJ found much of Etemadi's testimony to be untrue.

[3] The majority writes that "Etemadi's interpreter appeared to be unfamiliar with theological terms," citing that Etemadi's attorney had to translate the word "divinity." *See* Majority Opinion at 16 & n.4. From my review of the hearing transcripts, that appears to be the *only* instance in which the interpreter did not know how to translate a theological term.

[Etemadi's Counsel:]  Okay.  Now what is your religion currently?

[Etemadi:]  Christian.

[Etemadi's Counsel:]  What denomination of Christian [*sic*] do you belong to?

[Etemadi:]  There's an Iranian church in Fremont, and I'm a member of that church.

[Etemadi's Counsel:]  Do you know what the church is called?

[Etemadi:]  Iranian Fremont Christian Church.

To be sure, this line of questioning is not the strongest evidence of evasiveness. *Cf. Bingxu Jin v. Holder*, 748 F.3d 959, 962 (9th Cir. 2014) (upholding an IJ's finding of evasive testimony when the petitioner failed to respond to multiple inquiries about his residence).  And on direct review from the BIA, this testimony alone likely would not be enough to sustain the IJ's adverse credibility determination.  But the posture of this case demands that we ask whether it was clear error for the prior panel to rely, at least in part, on this testimony to show that there was substantial evidence for the adverse credibility finding.  Etemadi's counsel asked him about which "denomination" he belonged to.  Etemadi answered not by naming a denomination, but instead by

---

The transcript reveals no issues with interpretation of words like "baptized," "pastor," "the Holy Spirit," "Old Testament," and "New Testament."

stating that he was "a member of" the "Iranian church in Fremont." A specific church is not a denomination.

"[W]hen a petitioner contends that the IJ's findings are erroneous, the *petitioner* must establish that the evidence not only *supports* that conclusion, but *compels* it." *Farah*, 348 F.3d at 1156 (first emphasis added) (citation and internal quotation marks omitted). Etemadi points to no evidence submitted to the IJ, the BIA, or our court during the original proceedings that show he was a "nondenominational Christian." Majority Opinion at 16. In holding that the prior panel clearly erred in relying on this testimony, the majority uses *ex post* evidence and speculation. The majority highlights Etemadi's recent declaration in which he states that he does not "really relate to any particular denomination" of Christianity. But Etemadi attached that declaration to his 2018 motion to reopen, not his original asylum application. In setting aside a prior panel's decision and disregarding the law of the case doctrine, we must ask whether the evidence before that panel could not support the panel's decision, pursuant to a clear error standard. "This standard plainly does not entitle" the current panel "to reverse the" prior panel "simply because it is convinced that it would have decided the case differently." *Anderson*, 470 U.S. at 573. The current panel "oversteps the bounds of its duty . . . if it undertakes to duplicate the role of" the prior panel or the IJ because our "function is not to decide factual issues *de novo*," *id.* (citation and internal quotation marks omitted), and especially not to decide issues based on new factual allegations.

The majority also posits that "[n]othing in the record . . . indicates that Etemadi's church has a denomination" and that "many evangelical churches are nondenominational." Majority Opinion at 16. The majority cites nothing from the

record to show that either of these statements is true and effectively shifts the burden away from Etemadi to show that the prior panel clearly erred.[4]

The fact remains that Etemadi was asked a simple question by his own counsel: "What denomination of Christian[ity] do you belong to?"  Etemadi replied with the name of a church.  He did not state a denomination, and he did not state, "I do not belong to a denomination," or "My church has no denomination."  Pursuant to the extraordinarily deferential standard of requiring clear error that there was not substantial evidence, the prior panel could rely on Etemadi's answer.

Additionally, we must review Etemadi's testimony within the larger context of his religion-based asylum and CAT claims. *See Morgan v. Mukasey*, 529 F.3d 1202, 1210 (9th Cir. 2008) (deciding a credibility claim by "[v]iewing all the evidence in its context").  The Government's opposition to Etemadi's religion-based asylum and CAT claims was based on the idea that Etemadi had converted to Christianity for the purpose of strengthening his asylum and CAT applications, after Etemadi had admitted to giving false testimony regarding documents submitted with his original application.  Upon questioning from his own counsel, Etemadi testified that he "became familiar with" Christianity in 1998 and later was baptized.  Etemadi's own attorney attempted to rebut the Government's position by stating sarcastically: "Well, this is very convenient.  You've become a Christian while you're in removal proceedings."

---

[4] Never mind the fact Etemadi does not argue any of these points in his brief.  The majority's willingness to be advocates for Etemadi is a running theme, as indicated by the majority's decision to excuse waiver.

During cross-examination, the Government questioned Etemadi about having previously testified falsely:

> [Government's Counsel:]    Now, sir, what made you decide to come to this Court today and testify contrary to the testimony that you provided under oath to this Court previously, that three of the most critical documents in your case are fraudulent?
>
> [Etemadi:]  My approach is Jesus Christ.

When the Government asked whether Etemadi's admission that he lied during his previous testimony was because the Government submitted a forensics report showing Etemadi's supporting documents were fraudulent, Etemadi affirmed that his reversal was made "solely upon the basis of [his] conversion to Christianity."    Additionally, Etemadi, remarking this time that he had converted in 1997 or 1998, admitted that he had "come to [the immigration court] in the year 2000 and lie[d] under oath that the[] documents were true" because "[p]erhaps at that time, [he] was not so close to Jesus Christ."  The Government asked, "But weren't you a Christian in the year 2000?"  Etemadi replied by implying that his "former thoughts," alluding to his pre-conversion mindset, had to caused him to continue to lie during the 2000 testimony, despite the fact that he had already been attending church by that time.  After Etemadi offered to have his pastor testify at a later date, the Government noted that Etemadi had "had five years to present [his] evidence."

Etemadi submitted his original asylum application in May 1997, and the IJ originally questioned Etemadi about the veracity of that application in August 1997.  A letter from Etemadi's pastor stated that Etemadi "ha[d] been faithfully

attending worship services of the Iranian Christian Church in San Jose since April 1998," after submission of Etemadi's original asylum application. The Government's final argument to the IJ—as represented in its post-hearing brief—was that Etemadi's "attempt mid-way through his case to present an entirely new basis for asylum [(his conversion to Christianity)] is self-serving and questionable" and that "[h]is claim is self-serving and incredible in light of the overall posture of [the] case."

The IJ incorrectly wrote that Etemadi "stated that he was baptized in the Christian faith prior to the commencement of proceedings." Etemadi never stated that he was baptized prior to 1997. But Etemadi did not begin attending Christian worship services until after the proceedings began. The prior panel wrote that "Etemadi testified inconsistently regarding the timing of his conversion." *Etemadi*, 251 F. App'x at 389. That is true, and that was at the heart of the Government's argument regarding Etemadi's religion-based asylum and CAT claims. Even on a first appeal from the BIA, "[t]he cited evidence in the record, including a witness's own testimony, need not conclusively establish that the witness's testimony is false" to affirm an IJ's adverse credibility finding. *Lalayan v. Garland*, 4 F.4th 822, 836 (9th Cir. 2021). Under the even more deferential posture of this appeal, it was not clear error for the prior panel to hold that there was substantial evidence to affirm the IJ's adverse credibility determination based on Etemadi's inconsistent testimony about his conversion and how it affected his decision to recant his prior reliance on fraudulent documents.

### 2.   *Falsus in Uno, Falsus in Omnibus* Maxim

The IJ also "believe[d] it appropriate to discount all testimony offered by [Etemadi] in the" proceedings because Etemadi had lied under oath about the veracity of certain documents he submitted with his original application.  The prior panel relied on this finding to deny Etemadi's petition for review.  *Etemadi*, 251 F. App'x at 389 ("The IJ also made a general finding that all of Etemadi's testimony was rejected.  Etemadi's deliberate and knowing filing of forged documents provided the IJ grounds to discount all of Etemadi's testimony.").  The majority correctly asserts that the IJ appears to have used the maxim *falsus in uno, falsus in omnibus*.  *See* Majority Opinion at 19 (citing *Enying Li v. Holder*, 738 F.3d 1160, 1163 (9th Cir. 2013)).  This doctrine "is based on the logic that a person may mistakenly testify wrongly and still be believable, but if a person testifies falsely, willfully, and materially on one matter, then his 'oath' or word is not 'worth anything' and he is likely to be lying in other respects."  *Enying Li*, 738 F.3d at 1163 (citation omitted).

With regard to the *falsus* maxim, in 2013, after the prior panel decided Etemadi's first appeal, we restricted use of the maxim:

> The maxim *falsus in uno, falsus in omnibus* should not be applied when the truthfulness of the witness has no bearing on the claim, as is the case when the claim is based on proveable fact such as having two children or an undisputed ethnic classification.  Here, however, Li offers no evidence of her concurrent claims other than her testimony; whether the IJ found Li to be a liar as to part

of that testimony is entirely relevant, and
material, to both her claims.

*Enying Li*, 738 F.3d at 1167.

The majority contends that the *falsus* maxim does not
apply to Etemadi's asylum and CAT claims based on
religious persecution because Etemadi had corroborating
evidence to back up those claims.  *See* Majority Opinion at
20–21.  The majority holds that, "[i]n such cases, the *falsus*
maxim may not be used to wipe out a claim that is
corroborated by verifiable documentary evidence or
testimony."  *Id.* at 20.

I am not "left with the definite and firm conviction that"
the prior panel "committed" a mistake with regard to
application of the *falsus* maxim.  *Anderson*, 470 U.S. at 573.
First, we decided *Enying Li* in 2013.  We affirmed the BIA
in Etemadi's case in 2007.  Our case law applying the *falsus*
maxim at the time of our decision in *Etemadi* does not
contain the same limit on the doctrine when an individual
submits corroborating evidence.  *See Lopez-Umanzor v.
Gonzales*, 405 F.3d 1049, 1059 (9th Cir. 2005); *Cvitkovic v.
United States*, 41 F.2d 682, 684 (9th Cir. 1930); *Cent. Cal.
Canneries Co. v. Dunkley Co.*, 247 F. 790, 793 (9th Cir.
1917).[5]

---

[5] The majority's contention that these cases "are hardly on point" is
incorrect.  Majority Opinion at 20–21.  For the purposes of deciding
whether the law of the case doctrine applies, the question is not whether
these cases are exactly analogous to the case before the prior panel.
Instead, the question is whether the prior panel clearly erred in applying
our precedent concerning the *falsus* maxim.  Based on the precedent that
existed at the time the prior panel rendered its decision, that decision was

Second, even applying *Enying Li*, it is not clear that the IJ abused the *falsus* maxim. In *Enying Li*, we wrote that the maxim "should not be applied when the truthfulness of the witness has *no* bearing on the claim," and then described how Li had no corroborating evidence. 738 F.3d at 1167 (emphasis added). But here, Etemadi's truthfulness at least had *some* bearing on his claim of Christian conversion. Etemadi did have corroborating evidence to show that he had started attending church in 1998, but his own testimony undermined this contention because he was inconsistent about why he had recanted his earlier false testimony and the relationship of his faith to that recantation. Etemadi "is the same person who testified about both h[is] claims. Whether []he is a credible witness is central to any claim—religious persecution or [political opinion]. H[is] credibility goes to the heart of either and both claims." *Id.* at 1166.

Third, the majority's citation to *Guan v. Barr*, 925 F.3d 1022 (9th Cir. 2019), is equally unavailing. *See* Majority Opinion at 21–22. Not only did we decide *Guan* twelve years after the prior panel announced its judgment in Etemadi's first appeal, *see supra* n.5, but that case is also distinguishable. In *Guan*, "[t]he BIA's adverse credibility finding, which was based on an apparent inconsistency in Guan's testimony about his knowledge that the government officials were stealing from the general public, had nothing to do with his claim that he expects to be tortured based on his religious practices." 925 F.3d at 1035. In contrast, here

---

not clear error because application of the *falsus* maxim in *Enying Li* was not yet binding precedent. Both *Enying Li* and *Guan v. Barr*, 925 F.3d 1022 (9th Cir. 2019), post-date the prior panel's decision in this case. And the majority does not argue that either *Enying Li* or *Guan* are "intervening controlling authority [that] makes reconsideration appropriate." *Alaimalo*, 645 F.3d at 1049.

the IJ made an adverse credibility finding for Etemadi's religion-based asylum claim, which the IJ then applied to Etemadi's religion-based CAT claim. Thus, the majority is incorrect in stating that "[t]he IJ similarly denied Etemadi's religious-conversion CAT claim based on his discredited political-asylum claim." Majority Opinion at 22.

Ultimately, Etemadi "admit[ted] that []he made a conscious decision to lie" about his supporting documentation, which was "crucial to h[is] claim for permanent relief. It doesn't matter that the fact turned out to be irrelevant" to the religious persecution claim. *Singh v. Holder*, 643 F.3d 1178, 1181 (9th Cir. 2011). "What matters is that the petitioner chose to lie to immigration authorities. That always counts as substantial evidence supporting an adverse credibility finding, unless the lie falls within [a] narrow . . . exception" not relevant to this case. *Id.* It is possible to argue that the IJ and the prior panel might have erred in applying the *falsus* maxim. It is not possible to hold that the prior panel clearly erred in holding that there was substantial evidence to support the IJ's application of the *falsus* maxim.

### 3. Application of *Kamalthas*

Finally, the majority contends that the prior panel misapplied *Kamalthas v. INS*, 251 F.3d 1279 (9th Cir. 2001). *See* Majority Opinion at 22–24. In *Kamalthas*, we criticized the BIA for addressing the petitioner's CAT claim "'in a minimalistic and non-detailed manner'" and for "overrel[ying] on its prior adverse credibility finding against" the petitioner. *Kamalthas*, 251 F.3d at 1283–84 (quoting *Mansour v. INS*, 230 F.3d 902, 908 (7th Cir. 2000)). We remanded the case, in part, because we were "not comfortable with allowing a negative credibility

determination in the asylum context to wash over the torture claim; especially when the prior adverse credibility determination is not necessarily significant in this situation.'" *Id.* at 1284 (quoting *Mansour*, 230 F.3d at 908); *see also Shrestha*, 590 F.3d at 1048 ("An adverse credibility determination is not necessarily a death knell to CAT protection."). We additionally chastised the BIA for "conflat[ing] the burden of proof for an asylum claim with that for relief under" CAT. *Kamalthas*, 251 F.3d at 1283.

Here, the IJ reviewed the relevant law and clearly distinguished between the relevant standards for asylum and CAT relief. The IJ's discussion of the religious persecution claim was short. However, the IJ "does not have to write an exegesis on every contention." *Vilchez v. Holder*, 682 F.3d 1195, 1201 (9th Cir. 2012) (citation and internal quotation marks omitted). "When nothing in the record or the [IJ's] decision indicates a failure to consider all the evidence, a general statement that [the agency] considered all the evidence before [it] may be sufficient." *Cole v. Holder*, 659 F.3d 762, 771 (9th Cir. 2011) (citation and internal quotation marks omitted). The IJ listed all of Etemadi's documentary evidence, indicating that he considered that evidence. While the majority argues that the IJ allowed the adverse credibility finding to "wash over the torture claim," *Kamalthas*, 251 F.3d at 1284 (citation and internal quotation marks omitted), we do allow an adverse credibility finding to affect analysis of a CAT claim when the two claims "are based on the same statements," *Singh v. Lynch*, 802 F.3d 972, 977 (9th Cir. 2015) (citation and internal quotation marks omitted); *cf. Kamalthas*, 251 F.3d at 1284 (noting that "[w]e are not comfortable with allowing a negative credibility determination in the asylum context to wash over the torture claim; especially when the prior adverse credibility determination is *not necessarily significant* in this

situation" (alteration in original) (emphasis added) (citation and internal quotation marks omitted)).

The IJ determined that the adverse credibility finding was highly relevant to Etemadi's CAT claim. We relied on that same finding on appeal. *See Etemadi*, 251 F. App'x at 390. Our prior panel did not clearly violate our holding in *Kamalthas* by relying on the IJ's statements that he reviewed all the relevant evidence, his citation of the appropriate legal standards, and his short analysis of the CAT claim in affirming his decision.

## II. Waiver and Interpretation of 8 C.F.R. § 1003.2(c)(1)

One of the reasons that the BIA gave for denying Etemadi's motion to reopen was that Etemadi had "not submitted an application for relief," citing 8 C.F.R. § 1003.2(c)(1). Etemadi did not raise this issue in his opening brief. The Government alerted us to Etemadi's failure to raise this issue and his consequential waiver, but provided no briefing on the merits of the proper interpretation of § 1003.2(c)(1). Even with notice from the Government that he had waived this issue, Etemadi still failed to even mention § 1003.2(c)(1) in his reply brief.[6]

---

[6] The majority posits that Etemadi instead "*forfeited* any challenge to the BIA's decision on this issue." Majority Opinion at 25. The case law on forfeiture versus waiver in the immigration context is not a model of clarity. *See, e.g.*, *Santos-Santos v. Barr*, 917 F.3d 486, 491 (6th Cir. 2019) ("As an initial matter, Santos-Santos has *forfeited* any challenge to the [BIA's] determination that he failed to overcome the presumption of delivery of the notice of his hearing. *Ramani v. Ashcroft*, 378 F.3d 554, 558 (6th Cir. 2004) (holding that '[i]t is proper for an appellate court

"[O]n appeal, arguments not raised by a party in its opening brief are deemed waived." *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999). We regularly enforce waiver in the immigration context. *See, e.g.*, *Nguyen v. Barr*, 983 F.3d 1099, 1102 (9th Cir. 2020*); Sung Kil Jang v. Lynch*, 812 F.3d 1187, 1189 n.1 (9th Cir. 2015); *Lopez-Vasquez v. Holder*, 706 F.3d 1072, 1079–80 (9th Cir. 2013); *Rizk v.*

---

to consider *waived* all issues not raised in an appellant's briefs').") (emphases added)).

We also have confused forfeiture and waiver in this context. *Compare Martinez-Serrano v. INS*, 94 F.3d 1256, 1260 (9th Cir.1996) ("He fails to address how the BIA abused its discretion by denying his motion to reopen and reconsider its decision. Martinez-Serrano has thereby waived this issue."), *with Cestari-Cuenca v. Mukasey*, 302 F. App'x 692, 694 (9th Cir. 2008) ("Cestari-Cuenca has forfeited any challenge to the BIA's denial of the motion to reconsider because she failed to raise any argument related to the BIA's basis for denying the motion." (citing *Martinez-Serrano*, 94 F.3d at 1260)); *see also Austria Pedraza v. Mukasey*, 302 F. App'x 620, 621 (9th Cir. 2008) ("Austria Pedraza has *forfeited* any challenges to the BIA's order by failing to raise in his opening brief any arguments related to the BIA's determination that the motion to reopen was numerically barred. *See Martinez-Serrano v. INS*, 94 F.3d 1256, 1259–60 (9th Cir.1996) (holding that issues which are not specifically raised and argued in a party's opening brief are *waived*)") (emphases added)).

It does not appear that the exceptions to waiver would also apply to forfeiture. Thus, if the majority is correct that Etemadi actually forfeited the § 1003.2(c)(1) issue, we would necessarily have to deny his petition for review. Furthermore, we might lack subject matter jurisdiction to even consider the issue if it is forfeited. *See Rendon v. Mukasey*, 520 F.3d 967, 972–73 (9th Cir. 2008).

Based on *Martinez-Serrano*, I believe that this case is properly analyzed as one of waiver. *See* 94 F.3d at 1260. The majority implicitly agrees, as the majority analyzes the case pursuant to our waiver principles. *See* Majority Opinion at 26.

*Holder*, 629 F.3d 1083, 1091 n.3 (9th Cir. 2011). As the majority notes, we have elucidated three exceptions to the waiver rule. *See* Majority Opinion at 25–26 (citing *Koerner v. Grigas*, 328 F.3d 1039, 1049 (9th Cir. 2003)). The majority believes that "[a]ll three exceptions to the waiver rule apply here." *Id.* at 26 In my view, none of the three exceptions applies.

First, it is not clear that "failure to" consider the § 1003.2(c)(1) issue "would result in manifest injustice." *Koerner*, 328 F.32d at 1048 (citation and internal quotation marks omitted). For the reasons outlined above, I do not believe that the prior panel committed clear error in affirming the IJ's original adverse credibility determination. Excusing Etemadi's wavier of the § 1003.2(c)(1) would not result in a different outcome, as the prior panel's affirmance of the IJ's decision means that Etemadi's motion to reopen necessarily fails.

Second, the § 1003.2(c)(1) issue is not "raised in the appellee's brief," *id.* (citation and internal quotation marks omitted), in a manner sufficient to excuse waiver. The Government does note that the BIA denied Etemadi's motion to reopen for failing to comply with § 1003.2(c)(1). Contrary to the majority's contention, *see* Majority Opinion at 26, the Government offers no meaningful analysis of § 1003.2(c)(1) and how that regulation should be interpreted. The entirety of the Government's "analysis" of § 1003.2(c)(1) is a single paragraph that: (1) quotes the text of the regulation, and (2) cites a BIA decision interpreting the regulation. Despite the Government offering no real analysis of the issue, the majority *sua sponte* interprets § 1003.2(c)(1). *See id.* at 26–29. The majority even decides what level of deference to afford the BIA's interpretation of § 1003.2(c)(1), notwithstanding that the word "deference"

does not appear in either party's briefs even once. *See id.* at 29.

Third, and relatedly, the majority's choice to decide the § 1003.2(c)(1) question "prejudice[s] the defense of the" Government. *Koerner*, 328 F.32d at 1048 (citation and internal quotation marks omitted). The majority ultimately grants relief to Etemadi. Were the majority to refuse to excuse Etemadi's waiver, we would necessarily have to deny Etemadi's petition for review. *But the Government is not only prejudiced in this case, but in every future case involving § 1003.2(c)(1). The majority's decision binds future panels of our court as to the application of § 1003.2(c)(1).* Again, the majority undertakes this analysis—involving administrative deference and regulatory interpretation—despite neither party having briefed the merits of the issue. *Cf. Thompson v. Runnels*, 705 F.3d 1089, 1100 (9th Cir. 2013) (holding that "[b]ecause the legal issue *has been fully addressed by both parties*, and because it is a simple and straightforward question of law, we do not abuse our discretion in addressing it," despite the parties not raising the claim to the district court (emphasis added)).

The majority frames interpretation of § 1003.2(c)(1) as a simple issue, but it is actually more complicated than it appears. *Aliyev v. Barr*, 971 F.3d 1085 (9th Cir. 2020), should guide our analysis of the regulation. In *Aliyev*, the petitioner moved to reopen a previous asylum application. *Id.* at 1085. Citing § 1003.2(c)(1), "the BIA denied [Aliyev's] motion because he did not attach a new asylum application to it." *Id.* We held that "[t]he plain and unambiguous text of § 1003.2(c)(1) does not require someone in [Aliyev's] shoes to attach a new application for relief to a motion to reopen." *Id.* at 1086. But we specifically noted that Aliyev "attached to his motion to

reopen his prior asylum application." *Id.* Thus, "[i]n [that] circumstance, the prior asylum application that [Aliyev] sought to reopen [wa]s the 'suitable or proper' application to attach." *Id.*

In contrast, Etemadi did not attach *any* asylum or CAT application to his motion to reopen, including his October 2000 amended application that contained his religious persecution claim. *See* Majority Opinion at 27 n.5 (listing the documents Etemadi submitted with his motion to reopen, which do not include his prior asylum/CAT application). *Aliyev* left open the question of whether failure to attach any application violates § 1003.2(c)(1) by distinguishing a Third Circuit decision. *See Aliyev*, 971 F.3d at 1087 ("[I]n *Gen Lin v. Attorney General*, 700 F.3d 683, 689 n.5 (3d Cir. 2012), the Third Circuit upheld the BIA's denial of a motion to reopen where the petitioner 'did not file an accompanying application for relief of any kind.' By contrast here, [Aliyev] did attach the relevant application for relief to his motion to reopen."). Other circuits agree with the Third Circuit. *See, e.g.*, *Bi Feng Liu v. Holder*, 560 F.3d 485, 491 (6th Cir. 2009); *Palma-Mazariegos v. Keisler*, 504 F.3d 144, 147 (1st Cir. 2007) (per curiam); *Waggoner v. Gonzales*, 488 F.3d 632, 639 (5th Cir. 2007). *The majority now answers the question left open in Aliyev by creating a circuit split, all without briefing from the parties.*

The majority deflects from the circuit split it now creates by attempting to distinguish these cases. *See* Majority Opinion at 27–28. While *Liu* and *Palma-Mazariegos* involved motions to reopen based on new grounds for relief, the Sixth and Second Circuits did not rely on the fact that the petitioners had asserted new claims. The language from both of our sister circuits was unmistakably clear. For the Sixth Circuit, that "Liu did not append *an* application for asylum

to his motion to reopen" was enough for his motion to be "procedurally defaulted." *Liu*, 560 F.3d at 491 (emphasis added) (citing *Tapia-Martinez v. Gonzales*, 142 F. App'x 882, 884–85 (6th Cir. 2005) (Gibbons, J., joined by Boggs, C.J., and Quist, J.)). And for the Second Circuit, "Palma's motion to reopen was for the purpose of acting on *an* application for relief—to adjust status—yet was not accompanied by that application." *Palma-Mazariegos*, 504 F.3d at 147 (emphasis added). Neither circuit distinguished the situation where an individual seeking to reopen his or her case was applying for the same relief as before. *See also Waggoner*, 488 F.3d at 639. Similarly, in *Lin*, which the majority concedes "comes closest to" this case, Majority Opinion at 28, the Third Circuit was clear that the petitioner "did not file *an* accompanying application for relief of *any* kind." 700 F.3d at 689 n.5 (emphases added). All of our sister circuits have relied on petitioners' failure to attach *any* application.

Language from our court too has suggested that a motion to reopen requires a petitioner to attach *an* application. In *Romero-Ruiz v. Mukasey*, 538 F.3d 1057 (9th Cir. 2008), *overruled on other grounds by Cheneau v. Garland*, 997 F.3d 916 (9th Cir. 2021), the petitioner moved to remand his claim, arguing that "he had become eligible for cancellation of removal." *Id.* at 1061. The BIA denied the motion to remand, which the BIA treated as a motion to reopen, because Romero-Ruiz "had failed to file an application for cancellation of removal." *Id.* We affirmed the BIA because the motion "was not accompanied by an application for cancellation of removal" and "a motion to remand requires a completed application for relief." *Id.*

at 1064.**[7]**   While the circumstances of *Romero-Ruiz* are slightly different, our language in that case suggests that the appropriate application should be attached to the motion to reopen.

Additionally, the majority claims that we should not defer to the BIA's interpretation of § 1003.2(c)(1) because the BIA's interpretation of that regulation is not "authoritative."  Majority Opinion at 29 (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2416 (2019)).  Although the BIA's decision in this case was unpublished, an unpublished decision that relies on the same reasoning as a published decision can be afforded deference. *Cf. Route v. Garland*, 996 F.3d 968, 975–78 (9th Cir. 2021) (deciding that the BIA's interpretation of a statute in such a context was eligible for deference).   The BIA previously applied § 1003.2(c)(1) in a published decision.   *See In re Yewondwosen*, 21 I. & N. Dec. 1025, 1026 (BIA 1997); *see also Aliyev*, 971 F.3d at 1087 (citing *Yewondwosen*).**[8]**  The

---

**[7]** Notably, we also reviewed the BIA's decision to deny relief on this basis pursuant to the abuse of discretion standard, rather than giving it *de novo* review.  *See Romero-Ruiz*, 538 F.3d at 1064 ("Under the circumstances present here, the BIA did not abuse its discretion in determining that Romero-Ruiz did not satisfy the procedural requirements for a remand motion.").

**[8]** The majority is correct that the individual seeking relief in *Yewondwosen* originally applied for "relief from deportation" but then moved to remand based on "an application for adjustment of status." 21 I. & N. Dec. at 1025.  But the BIA's language in *Yewondwosen* applies to *all* motions to reopen, regardless of whether the same or different relief is requested: "the application form for *any* relief requested must be supplied by the moving party." *Id.* at 1026 (emphasis added).  Even if the BIA's interpretation was not strictly necessary to resolution of the individual's claim in *Yewondwosen*, "[w]hen the BIA

BIA has relied on *Yewondwosen* in a number of unpublished decisions. *See, e.g.*, *In re Abbas*, 2013 WL 2608461, at *1 (BIA May 14, 2013); *In re Ruben Sanchez*, 2009 WL 1030729, at *2 (BIA Mar. 30, 2009); *In re Ojo*, 2008 WL 486864, at *1 (BIA Jan. 24, 2008). The majority now overrules *Yewondwosen sub silentio* and disrupts BIA practice. Without briefing, it is unclear to me whether the BIA's interpretation of § 1003.2(c)(1) is deserving (or undeserving) of deference, especially in light of the recently-announced *Kisor* framework.

The BIA denied Etemadi's motion to reopen because of his failure to comply with § 1003.2(c)(1), and Etemadi neglected to even cite that regulation in either of his briefs. Pursuant to our regular waiver principles, that would have been the end of this case, and we should have simply affirmed the BIA's decision on that basis. Interpretation of § 1003.2(c)(1) is more complex than the majority makes it seem. I discuss the above-cited precedent from our court, our sister circuits, and the BIA not to show that the majority's interpretation of § 1003.2(c)(1) is necessarily wrong, but only to highlight why this case, where the petitioner has waived the issue, is not the proper vehicle to make a pronouncement that will bind future panels of our court.

The majority writes that "this issue has not been squarely addressed by any other circuit." Majority Opinion at 27. If that is true, I am puzzled as to why the majority believes it

confronts an issue germane to the eventual resolution of the case, and resolves it after a reasoned consideration in a published decision, resolution of that particular issue is eligible for . . . deference, including when the BIA relies on that reasoning in an unpublished decision." *Route*, 996 F.3d at 977 (citation and internal quotation marks omitted).

necessary to excuse waiver and decide complex questions of deference and regulatory interpretation in this particular case, without briefing, and in a manner that uniformly favors Etemadi's position.

## III.  Changed Country Conditions

Another ground that the BIA gave for denying Etemadi's motion to reopen was that Etemadi had "not demonstrated changed country conditions or circumstances material to his claim for relief."  Assuming that the prior panel's affirmance of the IJ, or Etemadi's failure to comply with § 1003.2(c)(1), did not doom Etemadi's motion to reopen, the BIA stated:

> [A]postasy has always been treated as a serious crime [in Iran], and [Etemadi] has not shown changed country conditions or circumstances regarding conversion. Similarly, [Etemadi] has not demonstrated that Iran's treatment of Christians has worsened since the Immigration Judge's hearing.  Rather, Iran's treatment of Christians is a continuation of those conditions presented at the Immigration Judge's hearing.

A motion to reopen has four requirements:

> A petitioner must (1) produce evidence that conditions have changed in the country of removal; (2) demonstrate that the evidence is material; (3) show that the evidence was not available and would not have been discovered or presented at the previous hearings; and (4) demonstrate that the new evidence, when considered together with the

> evidence presented at the original hearing,
> would establish prima facie eligibility for the
> relief sought.

*Agonafer v. Sessions*, 859 F.3d 1198, 1204 (9th Cir. 2017) (citation and internal quotation marks omitted). As the majority notes, "[t]he newly submitted evidence must be 'qualitatively different' from the evidence presented at the previous hearing. Evidence that simply recounts previous conditions presented at a previous hearing or that is voluminous but redundant is not sufficient to show a change in country conditions." *Id.* (citations omitted); *see* Majority Opinion at 31–32.

"We review the BIA's denial of a motion to reopen for an abuse of discretion." *Agonafer*, 859 F.3d at 1203. The Supreme Court has instructed us to be "[m]indful of the [BIA's] 'broad discretion'" in deciding motions to reopen, as the abuse of discretion standard is "deferential." *Kucana v. Holder*, 558 U.S. 233, 242 (2010) (citation omitted). "The BIA abuses its discretion when its denial of a motion to reopen is arbitrary, irrational or contrary to law." *Chandra v. Holder*, 751 F.3d 1034, 1036 (9th Cir. 2014) (citation and internal quotation marks omitted).

The evidence that Etemadi submitted with his original CAT application and his motion to reopen establishes that the Iranian government persecutes Christians and particularly targets Christian converts. For example, according to a 2000 State Department report, "[o]ne U.S.-based organization reported 8 deaths of evangelical Christians at the hands of authorities in the past 11 years and between 14 and 23 disappearances in the year between November 1997 and November 1998." Similarly, a 2015 State Department report noted that "[n]umerous Christians

remained imprisoned at year's end." While this evidence shows that Christian converts in Iran face persecution, and possibly even torture, the BIA did not abuse its discretion in finding that the newer evidence is not "qualitatively different" from Etemadi's original evidence. *Agonafer*, 859 F.3d at 1204 (internal quotation marks omitted).

The legal framework for persecution of Christians and Christian converts has not changed since Etemadi's original hearing. Both in 2002 and 2018, apostasy and proselytizing are punishable by death. Of course, official governmental policy is not the only evidence that torture is more likely than not to occur. *See Avendano-Hernandez v. Lynch*, 800 F.3d 1072, 1081 (9th Cir. 2015).

While the Iranian government continues to persecute Christian converts, the country reports attached to Etemadi's motion to reopen generally indicate that recent persecution is not qualitatively different from persecution in prior years. For example, in March 2017, the United Nations Special Rapporteur for human rights in Iran noted that Christian converts "*continue* to face arbitrary arrest, harassment and detention." Similarly, the 2015 State Department report stated: "Muslim converts to Christianity reportedly *continued* to face harassment, arrest, and detention" and "Christians, particularly evangelicals and converts, *continued* to experience disproportionate levels of arrests and high levels of harassment and surveillance, according to reports from exiled Christians." There is also some evidence that there has been an increase in harassment of Christians. *See* Majority Opinion at 31–32 (citing the 2016 report from the United States Commission on International Religious Freedom (USCIRF)). However, faced with some evidence of increased persecution of Christians in Iran, and other evidence of continued persecution, the BIA's conclusion that

Etemadi had "not demonstrated changed country conditions" was not "arbitrary, irrational or contrary to law" pursuant to the deferential abuse of discretion standard. *Chandra*, 751 F.3d at 1036.

The majority points to reports showing that churches have been shut down; that the Iranian government is preventing the ordination of new ministers; and that Christians were being arrested at social events. *See* Majority Opinion at 32–34. CAT relief requires that the petitioner show that "it is more likely than not that he or she would be *tortured* if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2) (emphasis added). Religious freedom is a fundamental human rights principle, but it is not clear that the persecution described by the majority rises to the level of torture. *See Wakkary v. Holder*, 558 F.3d 1049, 1068 (9th Cir. 2009); *Ahmed v. Keisler*, 504 F.3d 1183, 1201 (9th Cir. 2007).

While Etemadi need only make a prima facie case for CAT relief at this stage, that the majority relies on changed conditions regarding general persecution of Christian converts, rather than torture of those individuals, shows that the BIA did not abuse its discretion in denying the motion to reopen. The majority does not demonstrate that the recent country reports constitute evidence that Iran has increased its torture of Christians. *Cf. Malty v. Ashcroft*, 381 F.3d 942, 945–47 (9th Cir. 2004).

The majority's evidence also is similar to the evidence Etemadi submitted with his original CAT application. The majority cites the 2016 USCIRF report to show how many Christians have been "arbitrarily arrested and detained" in the past decade. *See* Majority Opinion at 31–32. Etemadi's evidence that he submitted with his original application,

particularly the 1998 report from Iranian Christians International, reveals similar levels of persecution of Christians. The scores of Christians arrested and interrogated over the course of a year in the late 1990s aligns with the 2016 USCIRF reports that "[s]ince 2010, [Iranian] authorities arbitrarily arrested and detained more than 550 Christians throughout the country."

Evidence of persecution that could rise to the level of torture has also been consistent. The majority notes that "'Christians who were arrested were reportedly subject to severe physical and psychological mistreatment' and that prison officials withhold medical care from Christian prisoners." *Id.* The 1997 and 2000 State Department reports contain similar evidence, with the 1997 report asserting that a pastor who "was found dead in a public park" was "widely believed to have been murdered by Iranian authorities."

The majority believes that the persecution of house churches is qualitatively different in Etemadi's new evidence. Although the 1998 Iranian Christians International report described "waves of attacks," the report noted that after one bishop was killed "the small home groups and house churches became endangered when the government agents planted informers in these groups." There is no indication that the Iranian government stopped attacking house churches after 1998, only to begin again in more recent years. The 2014 Danish Immigration Service report shows similar "monitoring [of] those who gather in house churches."

When we have held that the BIA abused its discretion in a motion to reopen, it has been because the old and new country reports had drastically different descriptions of the relevant persecution. In *Agonafer*, for example, the

petitioner's original application had "'no evidence in the record of any violence directed against homosexuals in Ethiopia,'" but "at least two of the reports submitted with Agonafer's motion to reopen provided reports of violence directed against homosexuals in Ethiopia since 2007, including violence in connection with imprisonment." 859 F.3d at 1206 (citation omitted). In contrast, there was a great deal of evidence that Iran persecuted Christians, and in particular Christian converts, at the time of Etemadi's 2002 hearing, and there was still evidence of that persecution at the time of Etemadi's 2018 motion to reopen. Under these circumstances, the BIA did not abuse its discretion in holding that Etemadi did not show evidence of changed country conditions.

"The reasons why motions to reopen are disfavored in [removal] proceedings are comparable to those that apply to petitions for rehearing, and to motions for new trials on the basis of newly discovered evidence." *INS v. Abudu*, 485 U.S. 94, 107 (1988). Our deferential standard for reviewing the BIA's denial of a motion to reopen is because "[t]here is a strong public interest in bringing litigation to a close as promptly as is consistent with the interest in giving the adversaries a fair opportunity to develop and present their respective cases." *Id.*; *see also Lona v. Barr*, 958 F.3d 1225, 1234 (9th Cir. 2020). Given that deference, I cannot say that the BIA's comparison of conditions for Christians in Iran in 2002 versus 2018 was "arbitrary, irrational or contrary to law." *Chandra*, 751 F.3d at 1036.

## IV. Conclusion

The petitioner's situation is one for which it would be normal to feel empathy. The petitioner, who showed evidence to the IJ and the prior panel that he converted to

Christianity, fears returning to Iran, a nation whose government is anything but empathetic towards Christian converts. However, the question presented in this case is not whether Etemadi is a Christian or even whether it is "more likely than not that he . . . would be tortured if removed to" Iran. 8 C.F.R § 1208.16(c)(2). Instead, the questions presented are whether we should cast aside a prior panel's disposition, whether we should excuse waiver and decide an issue of first impression without briefing, and whether the BIA abused its discretion in analyzing the Iranian government's persecution of Christians over the past thirty years. For each of these questions, our precedent mandates very deferential standards of review. The majority disregards the questions presented in this case and bypasses the deference we owe to the prior panel and the BIA. I respectfully dissent.